STATE EX REL. CRYDERMAN, RELATOR, *v.* WIENRICH
ET AL., RESPONDENTS.

(No. 4,175.)

(Submitted January 28, 1918.   Decided February 1, 1918.)

[170 Pac. 942.]

*Agriculture—Counties—Indebtedness—Seed Grain Law—Constitution—Taxation—Public Purpose—Loaning Credit.*

Statutes—Constitutionality—Duty of Courts.
1.   Where a statute is assailed as unconstitutional, the question is not whether it is possible to condemn but whether it is possible to uphold; hence it will not be declared unconstitutional unless its nullity is placed beyond reasonable doubt.

[As to caution observed by courts in respect to declaring statutes void, see note in 48 Am. Dec. 269.]

Agriculture—Counties—Seed Grain Law—Taxation—Public Purpose.
2.   *Held,* that the seed grain law (Chap. 13, Laws 1915), designed to furnish aid to persons engaged in agriculture who, because so reduced in circumstances by natural or other conditions beyond their control, that they have no means wherewith to purchase seed, is not in contravention of section 11, Article XII, forbidding taxation, for other than public purposes.

Same—Provisions of Act—For Whose Benefit.
3.   The benefits of the seed grain law above, *held* to be intended as much for farmers who do not own land, *i. e.,* homesteaders and renters, as for those who do.

Same—Destitute Farmers—Counties—Loaning Credit —Constitution.
4.   Construing section 1, Article XIII, Constitution, forbidding counties from giving or loaning their credit in aid of, or making any donation to, an individual, with section 5, Article X, making it the duty of the counties to provide for those inhabitants who by reason of misfortune may have claims upon the aid of society, the seed grain law does not offend against section 1, *supra.*

Same—Constitution—Appropriation—Public Funds.
5.   Section 35, Article V, prohibiting appropriations by the legislature for benevolent purposes, does not affect Chapter 13, *supra,* since the legislature made no appropriation for the purposes sought to be served by the Act.

Same—Counties—Incurring Indebtedness—Special Election.
6.   Chapter 13, Laws of 1915, *held* inoperative in any case in which the indebtedness sought to be created by a county bond issue is in excess of $10,000, upon a mere petition, section 5, Article XIII, of the Constitution prohibiting the incurring of indebtedness beyond the sum of $10,000 without the approval of the qualified electors, and no provision for such an election having been made.

The question of constitutionality of statute providing for farm loans is discussed in a note in L. R. A. 1917A, 495.

Original application for writ of injunction by the state, on the relation of M. Cryderman, against F. A. Wienrich and others, as the Board of County Commissioners of Sheridan County.  Writ issued.

*Messrs. Babcock & Ellery,* for Relator, submitted a brief; *Mr. C. R. Ellery* argued the cause orally.

*Mr. S. C. Ford,* Attorney General, submitted a brief and argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

Suit to enjoin the board of county commissioners of Sheridan county from holding a special election under the provisions of the Act approved February 16, 1915, known as the seed grain law (Chap. 13, Laws 1915).

The complaint shows that in consequence of a partial failure of crops in 1916, the long, hard winter of 1916–17, and the general failure of crops in 1917, due to the cold, late spring and the drought and hot winds of the summer of that year, there is now in Sheridan county a large number of farmers who are without seed grain for the coming season or financial resources with which to procure any, and who are destitute and will become dependent upon the county for support, unless such seed grain can be obtained; that with knowledge and in consequence of these facts, the board of county commissioners, after petition duly signed, presented and considered, as required by said Act, has called a special election of the electors of said county for the submission of the question whether said county shall issue and sell its warrants drawn on the general fund to an amount aggregating $300,000 for the purpose of providing means with which to purchase seed grain for the inhabitants of said county "who are resident freeholders" in need of seed grain and unable to procure the same; that the notice of said election is being published and such election will be held, unless restrained, at a large cost to the taxpayers of said county, including the plain-

tiff who is one of them; that the holding of said election should be enjoined because the Act of the legislature under which the same is called, and the only authority therefor, is void as in contravention of certain sections of the state Constitution.

The defendants appear by general demurrer, contesting the sufficiency of the complaint, and thus join issue upon the question sought to be raised, *viz.*, the validity, under the Constitution, of the seed grain law; but the demurrer is more far-reaching, for it also presents the question whether the defendants are proceeding in conformity with that law, should its validity be established.

The Act is entitled, "An Act authorizing counties to issue bonds or warrants to procure seed grain for needy farmers resident therein, * * * providing for the distribution of said seed grain among the needy farmers," *etc.;* its provisions, pertinent to the present inquiry, are: Section 1: In any county where the crops for the preceding year have been a total or partial failure by reason of drought or other cause, it shall be lawful for the board of county commissioners to issue bonds of the county, and with the proceeds derived from the sale thereof, to purchase seed wheat for the inhabitants of the county who are in need of seed grain and are unable to procure the same, whenever said board shall be petitioned in writing to do so, by not less than 100 freeholders resident in the county; provided that all such petitions shall be filed on or before April 1. Section 6: The board of county commissioners may issue warrants instead of bonds, if in their judgment the best interests of the county are thereby served; provided, that such warrants shall not be issued in any single amount to exceed $3,000. Section 7: The fund arising from the sale of said bonds or warrants shall be applied exclusively by the said board for the purchase of seed grain for residents of the county who are unable to procure the same; not more than 100 bushels of wheat or its equivalent in other grains to be furnished to any one person. Section 9: All persons entitled to and wishing the benefit of this Act, shall on or before April 1 file an application, sworn to, which shall

contain a true statement of the number of acres the applicant has plowed or prepared for seeding or intends to have plowed or prepared for seeding; how many bushels and what kind of grain he will require to seed the ground so prepared; how many bushels of grain he harvested in the preceding year; that he has not procured and is not able to procure the necessary seed grain for the current year; and said application shall contain a true and full description of all the real and personal property owned by the applicant, and the encumbrances thereon, and a true description by government subdivisions of the land upon which the applicant intends to sow said seed grain. Section 10: The board of county commissioners is appointed and constituted a board of examination and adjustment of the applications for seed grain, and must on the first Tuesday in March, or as soon thereafter as possible, examine and consider separately each application filed, and must determine who are entitled to the benefits of the Act, and the amount to which each applicant is entitled; and said board shall, on or before the tenth day of April, file its adjustment of said applications. Section 11: The county auditor, as soon as the board has acted according to section 10, shall issue to each applicant an order for the number of bushels of each kind of seed grain which has been allowed to such applicant; provided, the applicant first sign a contract promising to repay the cost of such grain, that the sum thereof shall be taxable against all real and personal property of the applicant, shall be due and payable on the first day of October in the year in which the grain is furnished, with interest from April 1 at six per cent, and if not paid on or before October 20, shall be extended as a tax on the land on which the grain is sown, or upon any other land owned by the applicant, and be collected as other taxes, and shall be a lien upon the real estate owned by said person until fully paid. Section 12: On the filing of the contracts provided for in section 11, the county shall acquire first preference liens upon the crops of grain raised each year by the person receiving seed grain to the amount of the sum due. Section 13: The person receiving such grain shall,

as soon as his crops for the year are harvested and threshed, market sufficient to pay the amount then due. Section 14: Upon the sowing of the seed obtained under the Act, the title and right of possession to the growing crop and to the grain produced shall, until the seed is paid for, be in the county which furnished it, as against any seizure or interference by anyone other than the applicant or his employees for the purpose of harvesting, threshing and marketing. Section 16: The commissioners of any county proposing to issue seed grain shall advertise such intention in such manner and for such time, prior to April 1, as may be possible, giving notice that all applications must be filed by April 1, but no distribution of grain shall take place before April 5; the commissioners shall have the right to refuse any application which they deem improper to grant, and they may revise their adjustment of applications at any time before distribution.

1. With this, as with all other Acts of the legislative assembly [1] assailed as unconstitutional, the question is not whether it is possible to condemn, but whether it is possible to uphold; and we still stand committed to the rule that a statute will not be declared unconstitutional unless its nullity is placed, in our judgment, beyond reasonable doubt. (*State ex rel. Hay* v. *Alderson,* 49 Mont. 387, 403, Ann. Cas. 1916B, 39, 142 Pac. 210.) Now, the outstanding purpose of the Act in question, as may be gathered from the abstract above set forth, is to furnish aid, in the shape of seed grain, to needy farmers who cannot themselves procure the same, and it is insisted that this may not be done, because (a) it is not a public purpose; (b) "neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation" (Const., Art. XIII, sec. 1); and (c) "no appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state" (Const. Art. V, sec. 35).

(a) Public authorities may not do by indirection what they cannot do directly; and forasmuch as the bonds or warrants [2] authorized by this Act to be issued and sold must, to the extent that repayment fails or is delayed, be made good by taxation, it is entirely clear that their issuance cannot be authorized save for a purpose for which taxation is lawful. Hence the rule that taxes may not be laid except for a public purpose is properly invoked. May this be considered such a purpose? That depends on what is meant by "needy farmers who are unable to procure seed"; for, vast and important as farming operations are, and worthy as they may be of such public encouragement as many of our statutes do authorize, still, as such, they are private and not public. But section 5 of Article X of the Constitution commands that: "The several counties of the state shall provide, as may be prescribed by law, for those inhabitants, who, by reason of age, infirmity or other misfortune, may have claims upon the sympathy and aid of society"—and there cannot be a doubt that under this section a family burned out of house and home, or by an epidemic isolated there, without money, credit or other means of support, would be persons for whom a county should provide. Is the duty to provide in such a case any the less imperative, and is the purpose to make such provision any the less public if, instead of one family, the disaster should involve a hundred or a thousand? And would it alter the case that all the unfortunates happened to belong to a particular class or to pursue a particular vocation? Now, to the farmer, unfavorably situated, drought, hail or other causes of crop failure may entail results equally ruinous and not different in character from those of pestilence or fire; they may drive him to the verge of the poorhouse, and he becomes, as the victim of misfortune, a person with claims upon the sympathy and aid of society—the more so as he is unwilling to become wholly dependent—for which the county may and must provide. If, therefore, the phrase "needy farmers who are unable to procure seed" may be taken to mean persons engaged in agriculture who, by natural or other conditions beyond their control, are so reduced

in circumstances that they have neither money, nor credit, nor property in shape to be pledged or mortgaged, and who without some aid will become paupers, dependent on the county for support—and we think this is the meaning—then the purpose to aid them is a public one, and the only subject left to consider is the validity of the means prescribed.

We realize that in *State ex rel. Griffith* v. *Osawkee Twp.*, 14 Kan. 418, 19 Am. Rep. 99, the court, in a precisely similar case and under a precisely similar constitutional provision, has taken other ground—holding, in effect, that one is not a proper subject of relief until he is actually a pauper, not only helpless, but hopeless. This case was decided in 1875, and the opinion, though written by one of the foremost jurists of that era, shows how even mighty minds are circumscribed by the spirit of their time. The argument is considered in the only two other seed grain cases in the books, and is fully answered in one (*State* v. *Nelson County*, 1 N. D. 88, 26 Am. St. Rep. 609, 8 L. R. A. 283, 45 N. W. 33), and discounted in the other (*Deering & Co.* v. *Peterson*, 75 Minn. 118, 77 N. W. 568); it no longer responds to the spirit, nor meets the needs, of an age which has learned that "an ounce of prevention is worth a pound of cure," and that it is sounder benevolence to help the needy to support themselves, to retain or regain their self-respect, than it is to wholly and forever keep them in the public charge and at the public expense.

We also realize that some phrases of the Act would seem to [3] indicate a limitation of its benefits to those farmers who own real estate and thus, by excluding the class—homesteaders and renters—most likely to need these benefits, to militate against the view that the statute can be taken as a measure of poor relief. But we are to consider the statute as a whole and to give it such construction as will validate it, if that may be done without violence to its language. So, assuming its general purpose to be as stated, these phrases—which relate to a listing of the property owned, with encumbrances, and provide for a lien upon both land and crops—are to be taken as applicable only so far as may be. The benefits of the Act cannot be denied to any

"needy farmer who is unable to procure seed," whether he owns land or only rents it, or occupies it without patent under the laws of the United States; but if he does own any property, it must be so encumbered that he cannot raise enough to buy seed and keep himself while the crop is maturing, and whatever he owns of real estate is, together with the crop, subject to a lien for the seed furnished. These details, so far from warring with the Act as a measure of poor relief, are, in our opinion, both just to the public and honorable to the recipient.

(b) Keeping in mind, then, that the Act is to be considered, [4] and can be vindicated only as, a measure of relief to those "who by reason of misfortune have claims upon the aid of society," we come to the means to be employed. Are they a violation of section 1, Article XIII, of the Constitution? Under any and every measure of poor relief known to the law and practice of this state, there is always a donation at least to some individual; this is as obnoxious to the section just referred to as a loan of credit or a grant; and it matters not that the dona-tion is or may be food, fuel or shelter, which cost money, instead of money itself. How may these be justified? Clearly by con-struing—as every rule of interpretation requires that we shall—section 1, Article XIII, with section 5, Article X, since these two are pertinent to the subject in hand; and, when this is done, we find the inhibition of the former modified by the command of the latter. The result is that no county may give or loan its credit in aid of, or make any donation or grant to, any individual save, in some manner prescribed by law, as a measure of prior relief; so that, if any course proposed is a measure of poor relief and is prescribed by law, there is no contravention of section 1, Article XIII, even though it should involve a loan or a donation. As a matter of fact, the origin and purpose of the restrictions in section 1, Article XIII, are well known. They arose in a time when the evils of public aid to railroads were notorious; they were intended to prevent the extension of such aid to either individuals or corporations for the purpose of fos-tering business enterprises, whether of a semi-public or private

nature; they had and were designed to have no reference whatever to suitable measures, elsewhere commanded, for the relief of the poor.

It may be argued, however—as in the Kansas case it was held—that the furnishing of seed grain to needy farmers is an aid to them in their private business, and thus within the restrictions above noted. The same may be said of any measure of poor relief which is not absolutely confined to paupers in the poorhouse; whether it may be properly so said in any case depends upon the primary object in view. If that object is to foster private enterprises and the only benefit to be derived by the public is incidental and secondary, then the restrictions apply, and the credit or donation may not be granted; but if the primary object is to prevent a class of needy citizens from becoming a permanent public charge, the fact that their own efforts and self-respect are called in to aid the design cannot make it the less a public one. The application upon an extended scale of such laws as this can only come in seasons of true calamity, when the question presented is whether a most important element of the population shall starve, be idly supported by the public without any prospect of alleviation, or be helped to sustain themselves. That the solution of such a question is primarily of public concern is perfectly plain, and deference is due to any enactment of the legislature in the rational effort to solve it.

(c) Section 35 of Article V has no relevancy here; it is **[5]** addressed to the legislature, and no appropriation by the legislature for any purpose is involved.

2. There is, however, a constitutional objection to this Act **[6]** which very seriously curtails its scope. Carelessly copied from the statutes of North Dakota, whose Constitution contains no such restriction as our section 5, Article XIII, it shows no effort to perform the very easy task of harmonizing itself with this restriction, but, on the contrary, assumes to authorize the issuance of bonds to an amount exceeding $10,000 upon a mere petition, and without submitting the question to the qualified electors of the county. That the incurring of an indebtedness,

whether by bonds or warrants, for the particular object contemplated by this Act is a single purpose may not be gainsaid, even though, as pointed out in *Panchot* v. *Leet,* 50 Mont. 314, 321, 146 Pac. 927, the aggregate of disbursements to the general poor cannot be so regarded. Being a single purpose, section 5 of Article XIII is an automatic limit to the indebtedness which may be incurred for such purpose without submission to the electors, and the Act must be construed with reference to this limitation unless it be wholly annulled. The mere absence of provisions for such submission would not be serious, since the general law (Rev. Codes, secs. 2933–2938) provides the method in such cases, if this Act could always be operated in connection with the general law. Unfortunately the contrary is true; the commands of this Act are so inconsistent with the general law as to negative any intent to include the general law by contemplation. To illustrate: Under the present Act, petitions for the issuance of seed grain may be filed as late as April 1, applications for the grain itself not later; the board must consider all the applications, filing its complete adjustment by April 10; as soon as this is done, an order for the grain shall issue, but no distribution of grain may occur before April 5. In other words, the board may, and possibly must, entertain petitions for the issuance of bonds, issue them, get the proceeds, buy the grain, receive applications, pass on them, and distribute the grain—all in the ten days between April 1 and 10, both inclusive. This is expedition indeed, and not objectionable when no resort to the electors is required; but it cannot be pursued consistently with the provisions of the general law, requiring ten days' publication of the election proclamation (Rev. Codes, secs. 2935, 454, 455), eight days' posting in each precinct of the names of the electors qualified to vote thereon (Laws 1915, Chap. 122, secs. 17, 32), thirty days' closing of the registration books after thirty days' notice of such closing (Laws 1913, Chap. 74, secs. 7, 18; *State ex rel. Kehoe* v. *Stromme,* 49 Mont. 25, 139 Pac. 1002; Laws 1915, Chap. 122, secs. 16, 32; Laws 1915, Chap. 130, sec. 7), and, following the election, ten days or more to canvass the returns and de-

clare the result (Rev. Codes, secs. 2933, 588–590). We are thus compelled to infer that the legislature, in framing this Act as it did and excluding the machinery by which an indebtedness of more than $10,000 could be authorized, never intended to permit any such indebtedness under it. To make it otherwise—by changing its term so to admit the operation of the general law relating to elections, or by prescribing special rules for the submission of this particular subject of indebtedness—is within the power of the legislature alone; until that is done, the scope of this Act stands limited by the Constitution to $10,000 for each county.

3. But though the Act itself may be upheld to the extent just stated, the proceedings here questioned may not, because they contemplated an expenditure of more than $10,000 for the particular object, and because they are not otherwise in conformity with the Act. Its purpose, as we have seen, is the relief of needy farmers who are unable to procure seed, and its benefits cannot be confined to those who have estates of freehold; yet this is precisely what the defendants propose to do and what they are submitting to the electors as their intention. Moreover, the Act limits the amount of warrants to be issued upon any one occasion to $3,000, and does not authorize this form of indebtedness multiplied a hundred-fold; but the action deliberately resolved and determined upon by the defendants is to issue warrants in the sum of $300,000. For these reasons the election cannot be allowed to proceed.

The demurrer to the complaint must be overruled; and as, according to our understanding, it was intended to present the decisive issue of law, no pleading by the defendants different in substance from the complaint being possible, it follows that a final decree according to the plaintiff's prayer should issue. So ordered.

Mr. Justice Holloway concurs.

Mr. Chief Justice Brantly, being absent, did not hear the argument and takes no part in the foregoing decision.