STATE ex Rel. CITY OF MISSOULA et al., Relators, *v.*
HOLMES, Insurance Commissioner, Respondent.

(No. 7,443.)

(Submitted June 3, 1935. Decided June 27, 1935.)

[47 Pac. (2d) 624.]

*Mr. Howard Toole, Mr. Ralph L. Arnold, Mr. Donovan Worden, Mr. George F. Higgins* and *Mr. W. T. Boone,* for Relators, submitted a brief; *Mr. Toole* argued the cause orally.

264

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. Jeremiah J. Lynch,* First Assistant Attorney General, for Respondent, submitted a brief; *Mr. Lynch* argued the cause orally.

266

*Mr. Harry Meyer, Mr. Charles P. Cotter, Mr. S. C. Ford* and *Mr. Sam D. Goza, Jr., Amici Curiae,* submitted a brief in support of the validity of the Act under attack; *Mr. Ford* argued the cause orally.

*Mr. Merle C. Groene, Amicus Curiae,* submitted a brief, contending that the Act is unconstitutional.

MR. JUSTICE ANDERSON delivered the opinion of the court.

The city of Missoula and its duly elected commissioners as relators brought this action in this court against the respondent John J. Holmes, as state auditor and *ex-officio* commissioner of insurance, seeking to enjoin the expenditure of money under, and the enforcement of, the provisions of Chapter 179, Laws 1935. It is asserted in the complaint that the provisions of this Act are violative of numerous constitutional provisions, and, furthermore, that the Act is void for uncertainty.

Section 1 of the Act provides "that all public buildings of this state and of each and every political subdivision thereof" and the contents thereof, "except as hereinafter provided, shall be insured by the state against all direct loss by fire, lightning, tornado, windstorm, cyclone, hail, explosion, flood and water damage," as provided for in the Act. The officers and authorities having charge of public buildings and their contents by virtue of a proviso are permitted to insure against earthquakes and other perils not enumerated in the section.

The state auditor and *ex-officio* commissioner of insurance is by section 2 made the administrative officer for the purpose of enforcing the Act, authorized to prepare blank forms "for the reports of valuation and relative hazard" of property insured, for losses sustained, "and for all other purposes necessary, proper and incidental to the effective operation and enforce-

270

ment'' of the Act. He is likewise authorized to make rules and regulations not inconsistent with the Act, ''as he may from time to time find practicable, necessary and beneficial'' for the conduct of the department.

Section 3 requires that the valuation of schoolhouses and contents of school districts shall be made by the school trustees; the valuation of county high school buildings and contents by the county high school board; the valuation of other public buildings owned by the counties, by the board of county commissioners; the valuation of public buildings, including libraries, owned by cities, by the mayor and aldermen; and the valuation of buildings owned by the state, and all other public buildings not otherwise enumerated in the Act, by the state board of examiners.

The provisions of section 4 relate to administrative details which are unimportant here.

Section 5 provides that ''there shall be paid into the State Treasury by the respective boards and officers having charge of the property insured under this Act, out of the funds from which insurance premiums have heretofore been paid,'' at the time specified in the Act, ''the amount of the premium for three years' insurance at the prevailing and commonly accepted insurance rate, as determined'' by the respondent, who may adjust the rates upon report of the fire marshal ''of any change in perils and exposures or error in classification.'' The insurance is to be written for three years. Cancellation of insurance may be allowed for reasonable cause upon the advice of the fire marshal, and shall be adjusted pro rata. All policies under the Act are to be serially numbered.

Section 6 commands the respondent to pay from the insurance fund on the first of each month into the fire marshal's fund 1 per cent. of the receipts during the preceding month.

Section 7 directs the respondent to set aside 3 per cent. of the total moneys collected from cities and towns having a fireman's disability fund, and at the end of each year to distribute the funds so set aside among all such cities and towns ''in accord-

ance with the same method of division now provided by Chapter 127 of the Session Acts of Montana of 1933."

Sections 8 and 9 provide as follows: "When the fund is found to exceed One Million Dollars ($1,000,000.00), then no more premiums shall be assessed until it becomes depleted to less than Seven Hundred Thousand Dollars ($700,000.00); whereupon assessment premiums, beginning after the last numbered policy paid, shall be levied in serial order until the fund again exceeds One Million Dollars ($1,000,000.00)." (Sec. 8.) "The State Board of Examiners must reinsure or purchase excess insurance in a reliable insurance company or companies such portion of their insurance liability as is commensurate with the principles of safe underwriting, and shall prescribe such rules and regulations as may be necessary in placing and handling this insurance and/or excess insurance. The cost of the reinsurance is to be paid out of the state insurance fund." (Sec. 9.)

Section 10 directs the mailing of notices of premiums to the proper officers and their payment within thirty days from the date of the levy and assessments, and provides "such assessment premiums to be levied only when needed to replenish and maintain such insurance fund and to be paid as hereinbefore provided."

Section 11 commands the state treasurer to receive the moneys paid under the Act and place the same to the credit of the "State Insurance Fund" to be paid out on warrants drawn by the respondent. This fund "shall be invested and administered as a part of the Montana trust and legacy fund under the provisions of Chapter Seventy (70) of the 1929 Session Laws of the State of Montana." Interest and earnings on the fund are to be credited to it by the state treasurer.

Sections 12, 13 and 14 are not under attack, and relate to the proof and payment of losses.

By the provisions of section 15 the state fire marshal is directed to investigate "the cause * * * and circumstances of each fire" and determine "whether the fire or other loss to public property insured * * * was the result of careless-

ness or design." Before any insurance is written, the fire marshal is required to inspect the buildings and report "all unnecessary and avoidable fire hazards" which shall be corrected and eliminated by the responsible board or officers, and a sworn statement thereof filed with the respondent before the insurance becomes operative. It is also provided in this section that: "The State Auditor and *Ex-officio* Commissioner of Insurance may on such report exclude such buildings from the provisions of insurance and shall collect no fees therefor."

Section 16 declares it to be "unlawful for any public officer mentioned in this Act and having charge of any public building or other public property to cause same or its contents to be insured in any other manner than that provided for in this Act." Upon the expiration of existing insurance all such property shall become subject to the provisions of the Act. The Act became operative on June 1, 1935.

Section 18 makes it the duty of all public officers to perform the duties imposed on them without additional compensation.

Section 19 declares a violation of this Act to be a misdemeanor and fixes penalties.

Section 20 declares that if any clause, sentence, paragraph, subdivision, section or part shall be adjudged to be invalid or unconstitutional, the judgment shall not affect, impair, invalidate or nullify the remainder of this Act.

Relators by their complaint allege, and the respondent by answer made on his behalf by the Attorney General admits, the corporate capacity of the city of Missoula; the election and qualifications of its commissioners; that it maintains and operates a fire department; that the city owns, maintains and operates buildings, contents and personal property, namely, a city hall, a city fire department, warehouse, road and street equipment, and other personal property in excess of $40,000 in value; that the buildings and personal property are of such a character as to be destructible in case of fire; that relators and their predecessors have carried and are carrying a sufficient amount of fire insurance in fire insurance companies and corporations qualified to do business within the state of Montana, which has

adequately protected and now does adequately protect the city against loss or damage to any of its property by fire and water; that Chapter 179 was enacted and approved on March 14, 1935; it alleges the official capacity of the respondent and the duties imposed upon him by the terms of the Act, and that pursuant to the terms thereof the respondent has made certain expenditures under, and is proceeding to the enforcement of, the Act, and will continue to expend funds for the carrying out of its provisions; that there are single units of property belonging to the state or its subdivisions which have an insurable value equal to or greater than the full maximum reserve provided for in section 7 of the Act; that school district No. 1 of Missoula county and other school districts, counties and cities within the state have and will have public buildings in process of construction; that the total value of public properties within the state subject to the provisions of the Act is approximately $45,000,000. The other allegations of the complaint are denied by the answer. Many of these allegations relate to the alleged unconstitutionality and uncertainty of this enactment, which we will notice presently. Some allegations of fact, however, are denied by the answer.

Since the cause has been submitted for decision without proof, all questions argued and based on these allegations are hereby eliminated from consideration. (*Rider* v. *Cooney,* 94 Mont. 295, 23 Pac. (2d) 261.)

In the case of *State ex rel. Tipton* v. *Erickson,* 93 Mont. 466, 19 Pac. (2d) 227, 228, we summarized the rules of law by which we are guided in the consideration of the question of the constitutionality of laws, which we reiterate: "In the determination of the question of the constitutionality of any Act, a statute, if possible, will be construed so as to render it valid. (*Hale* v. *County Treasurer,* 82 Mont. 98, 105, 265 Pac. 6.) It is *prima facie* presumed to be constitutional, and all doubts will be resolved in favor of its validity if it is possible so to do. (*State ex rel. Toomey* v. *State Board of Examiners,* 74 Mont. 1, 238 Pac. 316, 320.) The invalidity of a statute must be shown beyond a reasonable doubt before the court will declare it to be unconsti-

274

tutional. (*Herrin* v. *Erickson,* 90 Mont. 259, 2 Pac. (2d) 296.) And a statute will not be held unconstitutional unless its violation of the fundamental law is clear and palpable. (*Hill* v. *Rae,* 52 Mont. 378, 158 Pac. 826, Ann. Cas. 1917E, 210, L. R. A. 1917A, 495.) The Constitution is, as frequently stated by this court, a limitation upon the powers of the legislature, which in the passage of any law is acting under inherent powers, restricted only by the provisions thereof.'' (*State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708, 186 Pac. 697.)

Relators assert that the Act is unconstitutional as to cities and towns, in that it violates the provisions of section 36, Article V, of the Constitution, as well as of section 27 of Article III. The latter section prohibits the taking of property without due process of law.

A city or town is a true municipal corporation, whereas ▮▮▮▮▮▮ counties and school districts are bodies corporate. They are not municipal corporations, but rather political subdivisions. In the case of *Hersey* v. *Neilson,* 47 Mont. 132, 131 Pac. 30, 32, Ann. Cas. 1914C, 963, this court said: ''That the framers of our Constitution did not intend municipal corporations to include counties is clear, for the two terms are used to distinguish different organizations (sec. 6, Art. XVI; sec. 4, Art. XIII; *People* v. *McFadden,* 81 Cal. 489, 22 Pac. 851, 15 Am. St. Rep. 66). A county is a body corporate (sec. 2870, Rev. Codes), so, likewise, is a school district (sec. 848); but neither possesses the powers of local legislation and control which are the distinguishing characteristics of a municipal corporation.'' The powers granted to a municipal corporation are of two classes. ''The first including those which are legislative, public, or governmental, and import sovereignty; the second are those which are proprietary or quasi private, conferred for the private advantage of the inhabitants and of the city itself as a legal person.'' (*Campbell* v. *City of Helena,* 92 Mont. 366, 16 Pac. (2d) 1, 2; *State ex rel. Brooks* v. *Cook,* 84 Mont. 478, 276 Pac. 958; *Griffith* v. *City of Butte,* 72 Mont. 552, 234 Pac. 829; *Milligan* v. *City of Miles City,* 51 Mont. 374, 153 Pac. 276, L. R. A. 1916C, 395.)

The care and protection of the property of a municipality is a purely municipal function. (*State ex rel. Brooks* v. *Cook,* supra; 43 C. J. 183.) In the case of *Hersey* v. *Neilson,* supra, this court, speaking with reference to the power of the legislature over municipal corporations, said: "Because of its autonomous character—its enjoyment of a large measure of organic independence—the municipal corporation is relieved to a considerable extent from officious, meddlesome legislation which seeks to interfere with its private or proprietary functions. The theory of local self-government for municipal corporations is firmly established in this state. (*Helena Con. Water Co.* v. *Steele,* 20 Mont. 1, 49 Pac. 382, 37 L. R. A. 412; *State ex rel. Gerry* v. *Edwards,* 42 Mont. 135, 111 Pac. 734, Ann. Cas. 1912A, 1063, 32 L. R. A. (n. s.) 1078.)"

As to the first class of powers of a city enumerated above, the power of the legislature is supreme except as limited by express constitutional prohibitions; but as to the powers of the second class wherein the city is acting in a proprietary capacity, as distinguished from a governmental capacity, the theory of local government controls. This theory was first announced by this court in the case of *Helena Con. Water Co.* v. *Steele,* supra, and it has since consistently adhered to the pronouncement made therein, in the subsequent cases cited above. In that case the court quoted liberally from the decision of Judge Cooley, of the supreme court of Michigan, in the case of *People* v. *Common Council of Detroit,* 28 Mich. 228, 15 Am. Rep. 202, 206, wherein it was written: "The proposition which asserts the amplitude of legislative control over municipal corporations, * * * when confined, as it should be, to such corporations as agencies of the state in its government, the proposition is entirely sound. * * * They are not created exclusively for that purpose, but have other objects and purposes peculiarly local, and in which the state at large, except in conferring the power and regulating its exercise, is legally no more concerned than it is in the individual and private concerns of its several citizens. * * * It is a fundamental principle in this state [Michigan], recognized and perpetuated by express provisions of the constitution,

that the people of every hamlet, town and city of the state are entitled to the benefits of local self-government * * * But it cannot be contended that authority in the legislature to determine what shall be the extent of capacity in a city to acquire and hold property, is equivalent to, or contains within itself the authority to deprive the city of property actually acquired by legislative permission. As to the property it thus holds for its own private purposes, a city is to be regarded as a constituent in state government, and is entitled to the like protection in its property rights as any natural person who is also a constituent. The right of the state * * * is a right of regulation, * * * not a right of appropriation. * * * [It] cannot be deprived of such property without due process of law. And when a local convenience or need is to be supplied in which the people of the state at large, or any portion thereof outside the city limits, are not concerned, the state can no more by a process of taxation take from the individual citizens the money to purchase it, than they could, if it had been procured, appropriate it to state use. * * * From the very dawn of our liberties the principle most unquestionable of all has been this: That the people shall vote the taxes they are to pay, or be permitted to choose representatives for the purpose.''

The Supreme Court of the United States, in the case of *New Orleans* v. *Water Works Co.*, 142 U. S. 79, 12 Sup. Ct. 142, 147, 35 L. Ed. 943, said: ''But further citations of authorities upon this point are unnecessary. They are full and conclusive to the point that the municipality, being a mere agent of the state, stands in its governmental or public character in no contract relation with its sovereign, at whose pleasure its charter may be amended, changed, or revoked, without the impairment of any constitutional obligation, while with respect to its private or proprietary rights and interests it may be entitled to the constitutional protection.''

When operating in its proprietary capacity a city is subject to the same burdens, responsibilities and liabilities as a private corporation or individual acting in the same capacity; this is well illustrated by our decisions in *Campbell* v. *City of Helena*

and *Griffith* v. *City of Butte,* supra, and in *Public Service Com.* v. *City of Helena,* 52 Mont. 527, 159 Pac. 24. In all of these cases the city, while acting in its proprietary capacity, sought to claim immunity from the responsibilities incident to that capacity by asserting its sovereign power, which contention was in each instance denied. If the city, when acting in its proprietary capacity, is subject to the burdens, responsibilities and liabilities of others acting in proprietary capacities, it must logically follow that when acting in such capacity, it is entitled to the rights, privileges, and immunities accorded others.

We appreciate that many authorities may be, and have been, called to our attention announcing views somewhat at variance with our own; the foundation of the *Steele Case,* however, rests on the decisions of the Michigan court. In 1 McQuillin on Municipal Corporations, second edition, page 534, it is said of those decisions: "But in Michigan legislative interference with local affairs has perhaps been kept within narrower limits than in any other state, mainly due, no doubt, to the courageous position taken by its courts at the very beginning against such attempts."

It is here argued that because the Workmen's Compensation Act (Rev. Codes 1921, secs. 2816 et seq., as amended) is compulsory upon cities, no greater invasion arises here than there. Indeed, such was the reasoning advanced by the supreme court of North Dakota in the case of *Minot School District* v. *Olsness,* 53 N. D. 683, 208 N. W. 968, 45 A. L. R. 1337, upholding the constitutionality of a similar insurance Act. A compulsory Workmen's Compensation Law, however, as to individuals and private corporations has been held by the highest court in the land to be, as against them, a valid exercise of the police power not amounting to a deprivation of property without due process of law. (*Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 37 Sup. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D, 642.) Therefore, a compulsory Workmen's Compensation Law affecting cities and towns is only the regulation, under the police power, to which any citizen in similar circumstances may be subjected. We concede that if a private corporation or an individual en-

gaged in the same activities as a city in its proprietary capacity may be compelled to insure its property against the perils enumerated in this Act, then likewise may the city be so coerced.

Most cities have a city hall, which is the office building wherein its affairs are conducted. If the city has a water plant, there the water bills are collected and its business in connection therewith conducted. Likewise, with its other business activities. No one would assume to assert that the proprietor of a private water company who maintains an office building in which he collects the water rentals from the inhabitants of the city and conducts its business affairs could be compelled under a valid exercise of the police power to insure such office building against the perils enumerated in this Act in a state insurance fund. If such concern may not be compelled to insure, neither may the city, for to compel such insurance is to deprive an individual, a private corporation, or a city in its proprietary capacity of its property, namely, its money paid in premiums, without due process of law.

We are mindful of what this court said in the case of *McClintock* v. *City of Great Falls*, 53 Mont. 221, 163 Pac. 99. While some general statements appear therein which, if they are taken literally, lend support to the contention of counsel, the court also said that the power over cities by the legislature was limited to the constitutional provisions; and it is only by virtue of the constitutional provisions adverted to, supra, that we arrive at our conclusion here. The Act under discussion is unconstitutional and inoperative so far as it attempts to compel cities and towns against their will to insure their public buildings and property against the perils enumerated in the Act or subject its governing bodies to its penalties.

But because of the difference in the character of counties and school districts, on the one hand, and a municipality on the other, the authorities which restrain the legislature from intermeddling with the private affairs of a municipal corporation, are not in point when the question for determination is the right of the legislature to control school districts or county affairs. (*Hersey* v. *Neilson,* supra.)

It is next contended that the State Insurance Act constitutes a levy of a tax in contravention of the provisions of section 4, Article XII, of our Constitution, which provides: "The legislative assembly shall not levy taxes upon the inhabitants or property in any county, city, town, or municipal corporation for county, town, or municipal purposes, but it may by law invest in the corporate authorities thereof powers to assess and collect taxes for such purposes."

Here, there is no direct tax attempted to be levied by the legislature upon either the school district or county. But it is argued that perils are to be insured against which are not now ordinarily the subject of insurance, and, in order to secure insurance against these additional risks, it will be necessary for the school districts and the counties to expend additional sums of money, and thereby indirectly to levy a tax. Counsel rely upon the decision of this court in the case of *Helena Con. Water Co.* v. *Steele,* supra; but, as already indicated, what was there said was with reference to municipal corporations, and consequently is not in point.

Reliance is placed upon the decision of this court in the case of *State ex rel. Pierce* v. *Gowdy,* 62 Mont. 119, 203 Pac. 1115. There the validity of the so-called "bachelor's tax" law was involved. A direct tax was levied by that Act upon the individuals in a county coming within its provisions, the proceeds to be deposited in the poor fund of the county. Again, in the case of *Hauser* v. *Miller,* 37 Mont. 22, 94 Pac. 197, the legislature sought to levy a graduated tax upon estates in the course of administration, to be, when collected, deposited in the general fund of the county. In both cases a direct tax was levied upon certain inhabitants of the county, which was to be deposited in county funds to be expended for county purposes. Here there is no direct levy.

This court is committed to the holding that where by law a county or a political subdivision of the state must expend money which, but for the enactment of the law, it would not expend, the case does not come within the above constitutional prohibition. (*Weber* v. *City of Helena,* 89 Mont. 109, 128, 297 Pac.

455, 464; *State ex rel. Woare* v. *Board of County Commrs.,* 70 Mont. 252, 225 Pac. 389.) The contention is without merit.

It is argued by counsel for relators that the provisions of Chapter 179, requiring the deposit of one per cent. in the state fire marshal's fund, and the three per cent. in the firemen's disability fund, from the proceeds of the collections of premiums from cities, is violative of the same constitutional provisions. Since we have held that the provisions of the Act compelling cities and towns to come within its provisions are unconstitutional and eliminated therefrom, it is unnecessary for us to pass upon these questions so far as cities are concerned, and there remains the question whether the contribution to be made to the state fire marshal's fund is constitutional. What we have already said in connection with the questions heretofore discussed disposes of this contention adversely to relator's assertion.

We will next notice the contention that various provisions of the Act are so uncertain as to render them unworkable and, therefore, void within the rule announced by this court in the case of *State ex rel. State Board of Education* v. *Nagle,* ante, p. 86, 45 Pac. (2d) 1041, and the cases there cited: It is first asserted that under section 1 of the Act, the school districts and counties are required to insure against many perils such as floods, cyclones, hail, etc., which are not now recognized to be perils against which insurance is ordinarily carried, and therefore there is no "commonly accepted and prevailing rate" which the administrative officer can determine, and herein the law becomes unworkable. The allegations in the complaint asserting the nonexistence of such prevailing rates are denied by the answer; and since the cause has been submitted without proof, and the facts are not within our judicial knowledge, we cannot pass upon the issue. (*Rider* v. *Cooney,* supra.)

It is next asserted that section 8 is void for uncertainty and particularly when construed with section 10. The particular portion of section 8 which may be said to be ambiguous, standing alone, is as follows: "Whereupon assessment premiums, beginning after the last numbered policy paid, shall be levied in serial order until the fund again exceeds One Million Dollars ($1,000,-

000.00).'' By the last sentence of section 5 it is declared that all policies under the Act shall be numbered serially. The words ''policy paid'' are ambiguous. A policy of insurance is the written instrument by which a contract of insurance is set forth. (Sec. 8106, Rev. Codes 1921.) The word ''paid'' is defined by Webster's New International Dictionary, second edition, to mean ''given or handed over to discharge an obligation; discharge.'' The ambiguity arises as to whether the last policy paid refers to the last policy on which the premium was paid, or on one where a loss was paid. The policy of insurance contemplated by this Act is intended to endure so long as the political subdivision retains the ownership of the property insured, with a periodic liability for premiums. Under the ordinary commercial policy of fire insurance, the only obligation outstanding which might be paid is that with respect to loss. When the premium is paid, no further obligation to pay premiums accrues; but under the type of policy here contemplated, two obligations may arise which would require the payment of money: (1) The assessment premium, and (2) losses. A payment would operate to discharge either of these obligations, and the discharge of either obligation would cause the policy to be paid; that is, one of its obligations discharged. Since the legislature in this section was discussing premiums and not losses, we gather, from the context of the section, that the true legislative intent in using the term ''policy paid'' had reference only to the assessment premiums.

But it is said that when sections 8 and 10 are read together, it cannot be ascertained whether, while the fund is decreasing from $1,000,000 to $700,000, any premiums are to be paid, and, if none are to be paid until the fund is depleted to $700,000, in what manner thereafter premiums are to be levied. We find no difficulty in ascertaining the meaning of these two sections as read together. When the fund reaches $1,000,000, no premiums are to be levied until the fund becomes depleted to less than $700,000; immediately thereupon premiums will be levied on all policies which have been written without premiums and on all policies serially on which a three-year premium would have been

282

levied but for the suspension under the terms of section 8, and others as rapidly as their premiums again become due. To illustrate: Assuming that at the time the fund reaches $1,000,000, 1,500 policies have been issued. If by the time it is necessary to again levy premiums, or in other words, when the fund is below $700,000, 300 additional policies have been written on which no premium was paid, and of the 1,500 first written those numbered from 1 to 500 would have paid a premium but for their suspension, then immediately assessment premiums would be . laid on policies from No. 1501 to 1800, and on policies No. 1 to 500, and on the other policies between Nos. 500 to 1500, inclusive, as soon as their premiums became due in regular order, until the fund is again restored.

The only ambiguity which is urged, as we understand, is the expression "such assessment premiums to be levied only when needed to replenish and maintain such insurance fund." As we understand the Act, while the fund was being built up to $1,000,000 again, premiums would be levied not only to build up the fund, but to take care of any losses arising during the period of time necessary to again reach $1,000,000. The language of section 8 is emphatic that no premiums are to be levied while the fund is being depleted from $1,000,000 to $700,000, and, unless we attribute the meaning to the provisions of these two sections as indicated, the language of one nullifies the other; but, with this construction, each is harmonious and does not unduly impinge upon the provisions of the other.

It is next argued that the first sentence of section 15 is uncertain, in that it provides that the fire marshal shall investigate the cause, origin and circumstances of each fire occurring to public property, and determine whether the fire or loss to public property insured under the Act was the result of carelessnes or design. It is said that with reference to design, the fire marshal could report the matter to the proper authorities for prosecution, but that as to the provision of carelessness the Act is uncertain. The Act does not provide specifically what shall be done by the fire marshal or others in case he finds that public property was destroyed by carelessness. The only useful pur-

pose this provision could serve is that if public property was destroyed through carelessness, that is, the negligence, of some person, action might lie to recover for the damage thus sustained and thereby the insurance fund protected or replenished. By causing a prompt investigation, evidence might be collected or conserved to the end that recovery be had for the negligence resulting in the damage to the public property.

It is next contended that portions of section 15 render the Act void for uncertainty. After providing therein that the fire marshal shall inspect the buildings and file a report as to his findings, it is declared that: "He shall also report all buildings not properly insurable by reason of low value, extreme hazard or abandonment for more than four (4) months, or because the inspection thereof is unduly expensive by reason of extreme isolation. The State Auditor and Ex-officio Commissioner of Insurance may on such report exclude such buildings from the provisions of insurance and shall collect no fees therefor." By the provisions of section 16 it is declared that it is unlawful for any officer having charge of any public buildings or other public property to insure its contents in any other manner than provided in the Act, and, as noted, supra, by section 19 the failure to observe the provisions subjects officials to penalty. It is therefore urged that, should the fire marshal so report, and acting on the report, should the respondent decline to insure, no insurance could be obtained elsewhere by the governing board or officers on such property without subjecting themselves to the penalties of the Act. That these provisions are ambiguous to the extent of requiring construction we have no doubt. In the last sentence of section 15, if the words "of this Act" were substituted for the words "of insurance," the meaning would be clear. The legislature, however, has said that the respondent may exclude from the provisions "of insurance." The purpose of this entire Act is, speaking broadly, to provide insurance or a fund in lieu of insurance. Each and every provision of the Act relates to that general purpose and all of the provisions of the Act pertain to that one subject. Hence by the use of this awkward expression it was the intention of the legislature, ap-

284

parently, that the effect of such order of the respondent was to exclude such property from the operation of all of the provisions of the Act, as they all relate to the subject of insurance. Our position is further fortified when we refer to the first section, where it is specifically provided that certain exceptions are thereafter specified. True, some exceptions are provided for in that particular section; but if the intention of the legislature was only to refer to the exceptions contained in that section, the words "except as hereinafter provided," contained therein, could be eliminated from section 1, and, with the proviso remaining therein, that section would be operative. In order to give a meaning to the words "except as hereinafter provided," we must find some exceptions in the Act other than those occurring in section 1. Words may be changed in a statute in order to compel conformity with the intention of the legislature. (*Pomeroy* v. *Board of Equalization,* 99 Mont. 534, 45 Pac. (2d) 316, May 4, 1935.) We therefore conclude that under the terms of the Act, when the respondent orders a property excluded, the governing body or officer is free to secure other insurance elsewhere if available without subjecting it or himself to the penalties of the Act.

It is urged that the terms "extreme hazard," "extreme isolation," and "abandonment for four months" are so uncertain as to render the Act unworkable within the rule adhered to in the case of *State ex rel. State Board of Education* v. *Nagle,* supra, and cases there cited. In some of these cases it was sought by the legislature to define a crime; in others it was impossible to give any meaning to the provisions without the addition of words. In this case, so far as these particular words are concerned, no attempt is made thereby to inflict a penalty upon anyone. They are all English words defined in the dictionary, and it is for the administrative officer to determine from the facts in each case whether they come within the rule of the statute. By the express language the respondent is authorized on the report of the fire marshal to exclude certain property. The word "may" is used instead of "must," which in this case denotes discretion. We are unable to say that in this type of

statute they are uncertain to the extent that the law is unworkable. If they were used in defining a crime as in the case of the *Nagle Case,* supra, they might be vulnerable to the attack here made.

It is next argued that the Act violates section 36 of Article V of the Constitution, wherein it is provided: "The legislative assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes, or to perform any municipal functions whatever." This constitutional provision apparently first appeared in the Constitution of the state of Pennsylvania, adopted in 1874 (Art. 3, sec. 20) following the famous *Philadelphia Hall Case.* The history back of this constitutional provision is very well summarized in 1 McQuillin on Municipal Corporations, second edition, page 522, as follows: "In 1870 the legislature of Pennsylvania passed an Act designating certain persons whom the Act appointed commissioners to control the erection of new municipal buildings in Philadelphia. The Act constituted this body a close and perpetual corporation, since it was empowered 'to fill any vacancies which might happen by death, resignation or otherwise.' The commissioners were given unlimited power in the premises, as authority to create debts and enforce payment by compulsory tax levies to be made by the local authorities who were forced to register the will of the state board. Thus in the language of Biddle, J. [*Perkins* v. *Slack,* 86 Pa. 270, 272], 'a body not chosen by the taxpayers, nor removable by them, nor accountable to them are here authorized to levy upon them any sum of money they may at their discretion require.' The constitutionality of the Act was sustained, and the city was forced to furnish the requisite money and, as expressed by Hare, [See Hare Am. Const. Law, Vol. 1, Lecture 28, p. 630] 'for nearly twenty years all the money that could be spared from immediate and pressing needs' was 'compulsorily expended upon an enormous pile which surpasses the town halls and cathedrals of the Middle Ages in extent, if not in grandeur.' Paxson, J., of the su-

preme court of Pennsylvania [*Perkins* v. *Slack*, 86 Pa. 270, 283], mentions that public attention was subsequently 'drawn to the fact that irresponsible commissions, imposed upon the city by the legislature, and yet clothed with absolute control over the purse of the city in the prosecution of their work, were repugnant to the whole theory of our government'; and declared that 'the public buildings at Broad and Market Streets were projected upon a scale of magnificence better suited for the capitol of an empire than the municipal buildings of a debt-burdened city.' "

The Legislative Assembly does not by this Act delegate to any special commission, corporation, or association any power. If any power is delegated, it is to regularly elected or appointed state officials. We are unable to see wherein the Act in question violates this section of the Constitution.

It is contended that the Act amounts to a delegation of legislative power to the executive branch of the state government. This court in the case of *Chicago, M. & St. P. Ry. Co.* v. *Board of Railroad Commrs.*, 76 Mont. 305, 247 Pac. 162, 164, reviewed the authorities at considerable length on the question of what constitutes such delegation. After such review it recorded its conclusions in the following language: "Necessarily, the extent of the course of procedure and of the rules of decision are for the determination of the legislature. We think the correct rule as deduced from the better authorities is that if an Act but authorizes the administrative officer or board to carry out the definitely expressed will of the legislature, although procedural directions and the things to be done are specified only in general terms, it is not vulnerable to the criticism that it carries a delegation of legislative power."

It is said in support of this argument that the Act directs the respondent to prescribe the form of insurance policies, and many cases are cited wherein statutes delegating authority to an official to prepare the form of a fire insurance policy have been held to be vulnerable as a delegation of legislative power. It is suggested in support of this argument that the Act is silent as to whether certain ordinary provisions in the nature of exceptions

from liability found in a standard fire insurance policy would be included. The Act itself declares the perils against which the insurance will be written. It provides its own method for determining the value of the property. Exceptions from the risks are not made. In the absence of statutory authority, the respondent cannot write into these policies any of the ordinary exceptions. The only form of policy he can compile is one insuring against the perils enumerated in the language of the law, in whose favor written and the amount. The other forms authorized will of necessity conform to the Act itself. The legislature has declared the policy of the state; although some of the procedural directions are in general terms, nevertheless they are valid under the rule announced by this court in the case of *Chicago etc. Ry. Co.* v. *Board of Railroad Commrs.*, last above cited.

It is asserted that the Act violates the provisions of section 1 of Article XIII of the Constitution, because it requires the political subdivision to give or loan its credit or make a grant to the state of Montana. The basis of the argument in support of this contention is found in section 9 of the Act, where it is provided that the board of examiners "must reinsure or purchase excess insurance in a reliable insurance company or companies" such portion of their insurance liability as is "commensurated with the principles of safe underwriting." It is said that the board must reinsure the liability on state buildings and not on county and school district buildings but pay for their reinsurance out of the common fund, thereby using the contributions of the county and school district for that purpose, thereby amounting to a donation of credit or funds. The use of the word "their," preceding the word "liability," is not apt. In the first place, strictly speaking, the whole plan of this Act is not of insurance at all, but the establishment of a fund to take the place of insurance. This is well illustrated by the decision in *Commonwealth* v. *Nelson-Pedley Const. Co.*, 303 Pa. 174, 154 Atl. 383, 386, wherein the court, in discussing the effect of an Act similar in purpose, said: "Nor is there anything more substantial in the reference to the Insurance Fund Act of May 14,

1915, P. L. 524 [see 72 PS secs. 3731–3738]. The $1,000,000 directed by it to be accumulated is not an insurance fund at all; it is a fund accumulated to take the place of insurance in the instances to which the statute applies. The plan is not unique, but dates back at least as far as the days of Stephen Girard, for that great mariner had such a fund and paid into it the premiums he would have been obliged to pay if he had insured his numerous seagoing ships, and, when a vessel was lost, if he needed a new one, he paid for it out of that fund.''

Since the state has control of the fund, it cannot have a liability in favor of itself; against itself it may, however, have a liability against the fund. The words ''their liability'' can only mean ''the liability.'' The state board of examiners is not only authorized, but directed, to secure reinsurance against all the liability against the fund ''commensurated'' with safe underwriting. The funds contributed by the counties, school districts, and the state to this fund are all contributed either by the state or its political subdivisions, its component parts, and, hence, the liability is to the state or its political subdivisions as against the fund.

The purpose of this constitutional prohibition [sec. 1, Article XIII, supra] was stated by this court, in the case of *State ex rel. Cryderman* v. *Wienrich*, 54 Mont. 390, 170 Pac. 942, 945, as follows: ''They arose in a time when the evils of public aid to railroads were notorious; they were intended to prevent the extension of such aid to either individuals or corporations for the purpose of fostering business enterprises, whether of a semi-public or private nature; they had and were designed to have no reference whatever to suitable measures, elsewhere commanded, for the relief of the poor.'' (See, also, *Stanley* v. *Jeffries*, 86 Mont. 114, 284 Pac. 134, 70 A. L. R. 166, 168, and *McMahon* v. *Cooney*, 95 Mont. 138, 25 Pac. (2d) 131.) The Act does not violate this constitutional provision in the respect asserted.

By section 11 of the Act it is provided that: ''The said state insurance fund shall be invested and administered as a part of the Montana trust and legacy fund under the provisions

of Chapter Seventy (70) of the 1929 Session Laws.'' And under the provisions of section 1 of that chapter, the "unified investment plan" is provided for whereby all of the funds which are invested under the plan are invested as one common fund to be known as the "Montana Trust and Legacy Fund." Under this plan all securities purchased and all cash on hand will belong jointly to the various funds invested. They share the interest collected from investments, and losses, if any, are automatically distributed pro rata over all the funds, but each fund maintains its separate existence. Funds invested under the provisions of Chapter 70, Laws 1929, are to be invested subject to the special limitations of Article XXI of the state Constitution, which is an amendment adopted in 1924. Under section 6 of that Article, in making investments it is directed that ''preference shall be given to long term loans secured by first mortgages on town and city homes or on cultivated and producing farms in this state free from all prior liens and encumbrances, and also to Montana bonds issued for educational purposes.'' It is argued that under the provisions of Chapter 70, supra, and Article XXI, by making investments of this character, the credit of the county and school district is donated or loaned in violation of section 1 of Article XIII.

Article XXI provides for the investment under the above plan of certain funds therein enumerated ''and also other funds designated by the legislative assembly, when requested to do so by the authorities having the care and custody of such funds.'' (Sec. 10.) If investments made pursuant to Article XXI of the Constitution amount to a donation of money or credit within the meaning of section 1 of Article XIII, standing alone, since Article XXI was an amendment adopted in 1924 and section 1 of Article XIII is a portion of the original Constitution as adopted in 1889, any conflict between the provisions of the original Constitution and the provisions of the amendment must be resolved in favor of the latter. Any investments made pursuant to the provisions of Article XXI cannot, therefore, be held improper under the provisions of section 1 of Article XIII.

Much is said in support of this contention relative to the lack of wisdom and ill effects that will follow from making investments under this Article, of a fund of this class and character.

Whether the policy declared by the legislature in providing for investments of the insurance fund is wise, expedient, or desirable is not within the province of judicial tribunals. We said in the case of *Mills* v. *State Board of Equalization,* 97 Mont. 13, 33 Pac. (2d) 563, 568: " 'The judicial tribunals of the state have no concern with the policy of legislation. That is a matter resting altogether within the discretion of another co-ordinate branch of the government. The judicial power cannot legitimately question the policy, or refuse to sanction the provisions, of any law, not inconsistent with the fundamental law of the state.' "

It is urged that the provisions of section 34 of Article V of the Constitution are violated, in that money is directed to be expended from the treasury without any appropriation made therefor by law. The insurance fund is a special fund created by authority of law for a specific purpose. In the case of *State ex rel. Veeder* v. *State Board of Education,* 97 Mont. 121, 33 Pac. (2d) 516, 521, it was said: "As the Act has to do only with special funds to arise from the operations authorized and in connection therewith and devoted to a special purpose, it does not violate the provisions of sections 34 and 39 of Article V, or section 10 of Article XII, of the Constitution, respecting state moneys and the appropriation thereof. (*Barbour* v. *State Board of Education,* 92 Mont. 321, 13 Pac. (2d) 225; *State ex rel. Bickford* v. *Cook,* 17 Mont. 529, 43 Pac. 928)." (See, also, *State ex rel. Blume* v. *State Board of Education,* 97 Mont. 371, 34 Pac. (2d) 515; *State ex rel. Hawkins* v. *State Board of Examiners,* 97 Mont. 441, 35 Pac. (2d) 116.)

Lastly, it is urged that the Act is unconstitutional and void in that it violates the implied prohibition in the Constitution that states shall not engage in private business. We are committed to a holding that the state may engage in business within the limits amounting to a valid exercise of the police

power. (*State ex rel. Lyman* v. *Stewart*, 58 Mont. 1, 190 Pac. 129.)

The Act under consideration only applies to the state and its political subdivisions, and only amounts to the creation of a fund in place of insurance, and does not amount to the state's going into business. Therefore, the authorities cited in support of this contention are not in point. Let it be understood that we are not in any way passing upon the right of the state to enter into businesses of trade and commerce, as that question will receive consideration when a case presenting the question is before us.

As we have declared certain portions of the Act invalid, the ▆▆▆ question remains whether the invalid provisions are separable, leaving in the valid provisions a workable law. By section 20 of the Act the legislature has said that a judgment declaring a portion of the Act invalid shall not impair, invalidate, or nullify the remainder of the Act. In the absence of such a provision the presumption is against the mutilation of a statute, and that the legislature would not have enacted it except in its entirety. The incorporation of a provision such as section 20 creates a presumption to the contrary; namely, that the legislature would have enacted the law without its invalid portions being incorporated therein. (*Williams* v. *Standard Oil Co.*, 278 U. S. 235, 49 Sup. Ct. 115, 73 L. Ed. 287, 60 A. L. R. 596.)

The law, eliminating the provisions compelling cities and towns to come within its provisions is still workable as to the state, counties and school districts; in fact, many states have enacted a law having a similar purpose which applied only to the public buildings of the state, as sections 12680–12689, Compiled Laws of Michigan 1929, sections 8539–8554, Alabama Code 1928, and Chapter 166 of the Session Laws of Colorado of 1927 (page 656). We therefore conclude that the provisions of the Act which are not herein declared invalid constitute a workable law, and that the legislature would have enacted them as they stand in furtherance of its legislative purpose.

Let judgment be entered enjoining the respondent from enforcing the provisions of Chapter 179, Laws 1935, so far as they

compel cities and towns to come within the provisions of this Act, and denying relators any further or additional relief.

ASSOCIATE JUSTICES MATTHEWS, STEWART and MORRIS concur.

MR. CHIEF JUSTICE SANDS, being absent on account of illness, takes no part in the foregoing decision.