STATE ex rel. HAWKINS, Relator, *v.* STATE BOARD OF EXAMINERS et al., Respondents.

(No. 7,331.)
(Submitted July 10, 1934. Decided July 11, 1934.)
[35 Pac. (2d) 116.]

*Mr. E. G. Toomey* and *Mr. R. Lee Word, Jr.*, for Relator, submitted a brief; *Mr. Word* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, and *Mr. C. J. Dousman,* Assistant Attorney General, for Respondents, submitted a brief; *Mr. Dousman* argued the cause orally.

MR. JUSTICE STEWART delivered the opinion of the court.

The relator is a resident and taxpayer in the state of Montana. He seeks to enjoin the State Board of Examiners from proceeding further with their intention to issue bonds in the sum of $215,200, for the construction of a building or buildings for the Montana State Tuberculosis Sanitarium at Galen. This sanitarium was established in 1911. The State Board of Examiners has general control and supervision over it. The Act (Laws of 1911, Chap. 125) under which the institution was created provides for the admission of both private and free patients. It is supported by appropriations from the state general fund, augmented by charges made to private patients who are able to pay and so-called free patients whose maintenance expenses are charged to, and paid by, the counties, cities or towns from which they are admitted. The charges for treatment of the "free patients" are sent to the local authorities of each county having charge of relief of the poor of that county. The county thereupon pays the institution for the care and treatment of such free patients as have come from that particular county. Poor funds administered by the county commissioners are the source of county payments to the institution. The poor fund of a county is recruited from the poll and the general property taxes imposed by the county.

For some time there has been a desire and a need for increased facilities at the sanitarium in order more properly to accommodate and care for patients requiring treatment there. In accordance with this very apparent need, the State Board of Examiners was authorized by the extraordinary session of the legislature of 1933–34 to construct an additional building to be used in connection with the sanitarium. The Act (Chapter 22), authorized the board to issue bonds for the

construction of the building, and provided that the principal and interest of such bonds should be payable solely from the special funds provided in the Act. It further provided that the bonds were not to mature for more than thirty years from their date, and that they should contain a statement on their face that the state shall not be obligated to pay the same or the interest thereon except from the special funds set forth. It provided further (sec. 5) that "on or before the issuance of any bonds, the Board shall by resolution create a Sinking Fund for the payment of the bonds and the interest thereon, and the payment of charges of banks or trust companies for making payment of such bonds or interest, and shall set aside and pledge a sufficient amount of all rents and income received by the Board, such amount to be paid into said Sinking Fund at intervals to be determined by the Board prior to the issuance of the bonds," for the payment and retirement of the bonds.

The State Board of Examiners by resolution authorized the secretary of the board to apply for a loan and for a grant from the Federal Emergency Administration of Public Works for the construction of a building. In accordance with the authority contained in the resolution an application was so presented and is now pending.

It will thus be noted that this action has arisen as a result of the emergency legislation enacted by the extraordinary session of the Legislative Assembly of 1933–34. The legislature at that time, in response to the recommendation of the Governor, enacted a number of so-called emergency relief measures similar to the Act here under consideration. These Acts were designed to enable this state to take advantage of the benefits afforded by the National Industrial Recovery Act (48 Stat. 195), which permits the advance of federal funds for the construction of public works.

During the past few weeks this court has had before it at least four cases in which it was sought to test proceedings looking to the issuance of bonds under these various Acts so enacted as emergency relief measures. All of those cases involved pro-

ceedings very similar to those here proposed under Chapter 22, and all of them were presented for the sole purpose of having the validity of such Acts and proceedings passed upon by the court.

The case of *Shekelton* v. *Toole County*, ante, p. 213, 33 Pac. (2d) 531, involved a proposal to build a new courthouse for Toole county. *State ex rel. Veeder* v. *Board of Education*, ante, p. 121, 33 Pac. (2d) 516, 521, involved the proposal to construct a student union building at the State University in Missoula in accordance with Chapter 10, Laws Extra. Session 1933–34. *State ex rel. Blume* v. *State Board of Education*, ante, p. 371, 34 Pac. (2d) 515, dealt with the proposal to build a new building at the State Normal School in Billings under Chapter 7, Id. *State ex rel. Fisher* v. *School District*, ante, p. 358, 34 Pac. (2d) 522, involved the proposal to build a new high school building in Butte. In these cases the proceedings attacked were held to be valid, and it was found that there was an emergency existing such as to justify the emergency relief measures. In one or more of these cases this court has considered and passed upon practically every question that is raised in the case at bar. In fact, we find that every constitutional point raised in the instant case has been passed upon in at least one of the following three cases: (1) *State ex rel. Veeder* v. *Board of Education*, supra, hereafter referred to as the *Veeder Case;* (2) *State ex rel. Blume* v. *State Board of Education*, hereinafter called the *Blume Case;* and (3) *Barbour* v. *State Board of Education*, 92 Mont. 321, 13 Pac. (2d) 225, hereinafter called the *Barbour Case.*

We will first consider the question raised by relator as to whether an emergency exists so as to justify Chapter 22 as an emergency Act. In defendants' answer it is alleged that: ''The Montana State Tuberculosis Sanitarium as at present organized and operated is wholly unable to meet the urgent demand for admissions. The waiting list over a period of years has averaged fifty and the interval between the reception of the patient's application and admission has averaged three and one-half months. Tuberculosis being a disease

wherein recovery bears a direct relation to the speed with which, following the diagnosis, the patient is placed under treatment, the situation existing at present makes for the ultimate admission of patients in a moderately advanced stage of the disease, handicapping their chances of recovery and lengthening the duration of their sanitarium treatment.''

This and further allegations of similar import are not controverted by the plaintiff, either by reply or oral argument. Hence it would seem that these facts alone are sufficient to constitute an emergency as defined in the *Veeder Case*. In addition, there are present here substantially all the factors that were considered by this court in the *Veeder Case* as sufficient to constitute an emergency. (See, also, the *Blume Case*, supra.) We have no hesitancy in holding that the facts presented here are sufficient to sustain the Act (Chapter 22) as ''emergency'' legislation.

Relator asserts that Chapter 22 is in violation of section 2, Article XIII, of our Constitution, which provides: ''The legislative assembly shall not in any manner create any debt except by law which shall be irrepealable until the indebtedness therein provided for shall have been fully paid or discharged; such law shall specify the purpose to which the funds so raised shall be applied and provide for the levy of a tax sufficient to pay the interest on, and extinguish the principal of such debt within the time limited by such law for the payment thereof; but no debt or liability shall be created which shall singly, or in the aggregate with any existing debt or liability, exceed the sum of one hundred thousand dollars ($100,000) except in case of war, to repel invasion or suppress insurrection, unless the law authorizing the same shall have been submitted to the people at a general election and shall have received a majority of the votes cast for and against it at such election.''

In view of what was said by us in the *Barbour Case* and in the *Veeder Case*, it is apparent that the above section of our Constitution has been construed as prohibiting under certain conditions the incurring of indebtedness by the state. Chapter

22, however, expressly provides that "such bonds shall not constitute or be a debt, liability or obligation of the state, and shall be secured only by the rents and income of the buildings." (Sec. 2.) Thus it is clear that this Act does not create a state debt or liability, and the constitutional provision quoted above is not applicable. (*Barbour* v. *State Board of Education,* supra.)

The case of *State ex rel. Diedcrichs* v. *State Highway Commission,* 89 Mont. 205, 296 Pac. 1033, cited and relied upon by plaintiff, is not in point here. In that case the payment of the bonds was found to be a state liability. As we have already observed, Chapter 22 (just as did Chapter 10, considered in the *Veeder Case*) expressly declares that the bonds shall not constitute a debt or liability of the state.

The provision of the Act under consideration that the building may be mortgaged or deeded in trust for the benefit of the bondholders does not tend to subject the state to liability, because it does not purport to encumber any property owned by the state. There is no merit in the contention that the purchasers of the bonds may be led to believe that they are to be secured by general obligations of the state. In this respect the Act is plain and unambiguous. We fail to see how anyone could be misled in the manner suggested.

Relator contends that Chapter 22 violates section 33 of Article V of the state Constitution, in that it is an appropriation bill containing subjects other than the appropriation of money. The same contention was made in the *Veeder Case* in attacking Chapter 10 of the Laws of the Extra. Session of 1933–34, an Act very similar to the one under consideration here. In that case it was said: "It is asserted that Chapter 10, above, is violative of section 33, Article V of the Constitution, requiring that 'appropriations shall be made by separate bills, each embracing but one subject.' Assuming that the Act contains an appropriation, such appropriation is but an incident to the single subject of the legislation, and such inclusion is not violative of the constitutional provisions. (*Hill* v. *Rae,* 52 Mont. 378, 158 Pac. 826, Ann. Cas. 1917E, 210,

L. R. A. 1917A, 495; *State ex rel. Campbell* v. *Stewart,* 54 Mont. 504, 171 Pac. 755, Ann. Cas. 1918D, 1101.)'' We think this language is applicable and controlling in the present instance. In conformity with the views there expressed, we conclude that Chapter 22 does not run counter to section 33, Article V, supra.

Relator also alleges that Chapter 22 violates section 34, Article V, of our Constitution, which declares that state funds shall not be paid out of the state treasury except upon appropriations made by law, in that, while the Act contemplates the expenditures of state moneys, no appropriations have been made by the legislature to cover such expenditures. But here again we find the question raised was definitely decided in the *Veeder Case.* In that case it was held that: ''As the Act has to do only with special funds to arise from the operations authorized and in connection therewith and devoted to a special purpose, it does not violate the provisions of section 34 and 39 of Article V, or section 10 of Article XII, of the Constitution, respecting state moneys and the appropriation thereof. (*Barbour* v. *State Board of Education,* 92 Mont. 321, 13 Pac. (2d) 225; *State ex rel. Bickford* v. *Cook,* 17 Mont. 529, 43 Pac. 928.)''

With reference to this particular question we are unable to find any difference between the facts and law as presented in the *Veeder Case* and those presented in the case at bar. In this case the Act deals only with special funds ''to arise from the operations authorized and in connection therewith and devoted to a special purpose.'' Hence, under the decision in the *Veeder Case,* it does not violate section 34 of Article V of the Constitution. (See, also, *State ex rel. Blume* v. *State Board of Education,* supra.)

There is no merit in the suggestion that Chapter 22 violates section 1 of Article XIII of the Constitution, in that it attempts to give or loan the credit of the state and its property to individuals, associations or corporations. The Montana State Tuberculosis Sanitarium at Galen unquestionably is a state institution. It cannot in any manner be regarded

as a private institution belonging to individuals, associations or corporations, other than the state of Montana. (Compare *Barbour* v. *State Board of Education,* supra.)

Relator contends that this Act violates section 12 of Article XII of the Montana Constitution, in the following particulars: (1) That it attempts to appropriate public moneys and make the same available for a longer term than two years; and (2) that it attempts to appropriate public moneys without regard to the taxes provided by law, without any proceeds or receipts from taxes being applicable to such appropriations or expenditures, and without levying taxes to provide such funds in excess of taxes provided by law either already in the treasury or levied.

The first of these objections was considered and passed upon in the *Veeder Case* and in the *Blume Case.* In both of those cases it was held, under Acts similar to Chapter 22, "that the pledging of earnings of a state school is not violative" of section 12 of Article XII, supra. There can be no logical distinction between the pledging of the earnings of a state school and the pledging of earnings of a state tuberculosis sanitarium.

The second objection does not impress us as being of sufficient importance to warrant more than brief mention. Section 12 of Article XII contemplates the making of appropriations or providing for payments in those cases where funds are not otherwise provided. Since in this case the Act expressly provides for the necessary funds (from the earnings of the institution), it is apparent that there is no violation of the constitutional provision in question. (Compare *State ex rel. Veeder* v. *State Board of Education,* supra.)

Relator suggests that Chapter 22 violates section 4 of Article XII of the Constitution, "in that said Act attempts to levy taxes upon the inhabitants of the various counties in the state for county purposes." It does not appear in this case that any taxes whatsoever are levied upon the counties. Under the provisions of the Act, the counties will merely continue to pay for the care of their respective patients in the

sanitarium in the same manner as they have always done. There is no additional tax placed upon the counties or anyone else.

There is nothing in the Act which conflicts in any manner with section 11 of Article XII of the Constitution, which provides that "taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax." As we have already noticed, the Act does not impose any additional burden upon the various counties, either in the way of taxes or otherwise. It is apparently conceded that the money which the institution now receives from the counties for the care of. patients is "money lawfully acquired from the various counties of the state." There is nothing in section 11 of Article XII to prohibit the state from using money lawfully acquired from the counties for the purposes specified in Chapter 22. The counties, without any additional burden or tax imposed upon them, will receive benefits corresponding to those which they are now receiving for the money thus expended by them. It is manifest that the proposed diversion of the payments now received from counties and heretofore used for maintenance will of necessity reduce the maintenance fund of the institution and require a larger contribution from the state in the way of appropriations from the general fund of the state. But this is a matter of legislative discretion and something with which we have nothing to do at this time.

Relator asserts that the money now contributed by the counties for the care of patients cannot legally be diverted to another purpose, viz., construction of a building. We are unable to find, in any of the constitutional provisions to which our attention has been directed, a prohibition against such a diversion of money as proposed in this case. Indeed, such a diversion of money for the purpose of constructing a building was expressly upheld by this court in the *Blume Case*, supra.

Finally, relator argues that Chapter 22 violates section 5 of Article XIII of the Constitution, in that it is possible

under the Act that some of the counties may necessarily incur an indebtedness or liability in excess of $10,000, "without the approval of a majority of the electors thereof." It is not contended that the money which the counties are now paying to the institution is in violation of this section. Hence there is no conceivable reason why the diversion of such money to the construction of a building should change the situation so far as that particular constitutional provision is concerned. It is also important to note that the constitutional provision in question here apparently contemplates a "fixed" liability or indebtedness. Under the present system as herein outlined, the amount payable by the respective counties to the institution is not fixed; it is contingent upon the number of patients from a county that are kept and treated in the sanitarium. Chapter 22 does not assume to change this plan of contingent liability already resting upon the counties. The extent of such liability will depend, just as it does now, upon the number of patients from a given county receiving care and treatment in the sanitarium.

In the recent case of Nelson v. Jackson, ante, p. 299, 33 Pac. (2d) 822, 824, this court dealt with a similar question, and said: "It will be noted that, in all of our cases wherein an expenditure was condemned (as violating section 5 of Article VIII, supra), it was founded on a liability for a single occasional purpose; as the building of a courthouse, the borrowing of money for immediate needs, the bridging of a river, and the building of a county high school. Here we have an expenditure founded on a duty expressly imposed by law to meet an ever-present condition encountered in the regular and normal functioning of the county." In this matter it is likely that the counties will be called upon to make payments for an indefinite time. The necessity is painfully present now, and in spite of all of the humane endeavors of a sympathetic people, we are forced to say that we are confronted by a condition well within the meaning of an "ever-present condition."

After carefully considering all the objections raised by the relator, we conclude that Chapter 22 does not violate any of the provisions of the Constitution of Montana.

The injunction is denied and the cause is dismissed.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MATTHEWS and ANDERSON concur.

MR. JUSTICE ANGSTMAN, being absent, takes no part in the above decision.