STATE EX REL. NORMILE ET AL., RELATORS, *v.* COONEY, GOVERNOR, ET AL., RESPONDENTS.

(No. 7,464.)

(Submitted July 3, 1935. Decided July 10, 1935.)

[47 Pac. (2d) 637.]

394

*Mr. John G. Skinner* and *Mr. Clyde McLemore,* for Relators, argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, *Mr. Charles J. Dousman,* Assistant Attorney General, and *Mr. Edwin S. Booth,* for Respondents, submitted a brief; *Mr. Dousman* and *Mr. Booth* argued the cause orally.

Opinion: PER CURIAM.

This is an original proceeding seeking to enjoin the State Water Conservation Board from proceeding with the construc-

tion, in Carbon county, of the "Rock Creek Project," consisting of an irrigation and flood control project pursuant to an application of the State Water Conservation Board, and under the terms of a "loan-grant agreement" with the United States of America, as authorized by the provisions of Chapter 35 of the Extraordinary Session of 1933–34, and Chapters 95 and 169 of the Laws of 1935.

Chapter 95, supra, amends certain sections of Chapter 35 and adds certain additional sections. Chapter 169 is an Act supplemental to the other chapters.

Section 1 of Chapter 35 declares that water conservation is a state purpose. Section 2 defines the terms used in the Act; the only one of which necessary here to notice is found in subdivision (e) thereof, providing as follows: "The word 'project' shall mean any one of the works hereinabove defined or any combination of such works which are physically connected or jointly managed and operated as a single unit." Section 3 provides for the creation of the "State Water Conservation Board," its organization and compensation. The purpose of the Act is declared in section 5, as amended by Laws 1935, Chapter 95, section 2, as follows: "The purpose of this Act is to meet, so far as possible, a state-wide need for the conservation and use of water, through the construction and operation of projects designed for such purposes. The board is therefore empowered to make such investigations as may be necessary to plan and carry out a comprehensive state-wide program of water conservation. The projects to be finally constructed shall qualify as parts of such state-wide program and shall be approved by the board upon the showing of their prospective ability to meet, through the sale of water or other services, the cost of operation, maintenance and repair and the amortization of the cost of the construction; provided, however, that the failure of the board to determine such prospective ability of a project shall in no way affect the validity or enforceability of any of such bonds or of the trust indenture, resolution, or other security therefor."

It is provided by Chapter 95 that the board is a public corporation deemed to be an agency of the state.

The plan, briefly summarized, is as follows: The board will investigate the feasibility of the development of various water conservation projects. If the estimated revenues from any project are sufficient to repay the cost of the project, then the board may proceed to construct the necessary works with the proceeds of the bonds of each project and any grants obtained from the United States of America or elsewhere. All money obtained by loan is to be repaid from the revenues derived from the sale of water and other services in the operation of the project. It is expressly provided that these bonds are not to be the obligation of the state of Montana, and must so specify on their face. The board is authorized to pledge the revenues to secure the repayment of loans, and to mortgage the property acquired on the project to secure their repayment, in its discretion. Under the terms of the law, any money expended by this board in the investigation and construction of a project is to be repaid from the proceeds of the loan. All bonds are to be issued on each project in a separate series. Numerous provisions are found in the Acts providing for the creation of various funds in the administration of the Act. The board is given special authority to contract with and borrow from the United States and its governmental agencies.

Relators' petition discloses that an application for a loan of $826,000, and a grant of 30 per cent. thereof, has been made. Also a loan and grant agreement has been executed between the Water Conservation Board and a governmental agency, the bonds to be payable from the revenues of the project as sole security for the loan. The rates and charges to be collected from the sale of water and services are determined by a contract between the conservation board and the Rock Creek Water Users' Association. The Water Conservation Board, under the terms of the loan and grant agreement, is to retain ownership and control of the project so long as the bonds are outstanding. Copies of these various contracts are appended to the petition.

It is asserted in the petition that the above legislative Acts in certain particulars are in conflict with numerous provisions of our Constitution; that the provisions of Chapter 169 impliedly repeal certain provisions of Chapters 35 and 95, and that certain of the contracts were irregularly executed. We will notice these various contentions separately in our discussion throughout this opinion. The cause is submitted for decision upon a motion to quash challenging the sufficiency of the petition as to substance.

The first question raised is one of statutory construction; it being charged that: ''Chapter 169, Laws of Montana 1935, repeals by implication the provisions of said Chapter 95 of the same session, and of Chapter 35, passed at the previous session, in so far as the latter Acts purport to authorize the State Water Conservation Board to pledge as security for its bonds the gross revenues of a project financed with the proceeds thereof, to deposit with a trustee for such bondholders all monies collected under a water marketing agreement and water purchase contracts in connection therewith, to create a special fund for monies reserved for bond principal, interest and redemption and for future operating costs.''

Had it been the intention of the legislature to do away with the provisions mentioned and with which it had dealt during the very session in which it enacted Chapter 169, it would seem that that body would have expressly so declared and not left the matter to implication. While it is true that, if one statute conflicts with a portion of another so as to exhibit an inconsistency, the inconsistent portion of the previous statute cannot stand and it is said to be repealed by implication, such repeals are not favored by the courts, and, where the two are passed at the same session of the legislature, the presumption against repeal is strong. In considering such a charge as this, the true intention of the legislature is to be ascertained, if possible, and followed, and, before the doctrine of implied repeal is applied, the court should make every effort to reconcile the statutes and render every provision of each effective. (*State ex rel. Nagle* v. *Leader Co.,* 97 Mont. 586, 37 Pac. (2d) 561.)

To determine the intention of the legislature, the history of the legislation may be resorted to. (*Melzner* v. *Northern Pacific Ry. Co.*, 46 Mont. 162, 127 Pac. 146.) The State Water Conservation Board was created by Chapter 35, above, and therein it was provided for the construction, operation and maintenance of a system of works for the conservation, development, storage, distribution and utilization of water. The Act contemplates the inclusion of all projects undertaken and carried out by the board in the one all-comprehensive "system." These projects, undertaken as public works, are, under this Act, to be financed "wholly by means of or with the proceeds of revenue bonds * * * and other funds provided under the authority of this Act." (Sec. 5.) While the Act provides for revenues to be derived from the projects, the only "other funds" which might go to augment the construction fund of a project are grants from the United States (sec. 10) or appropriations or donations (sec. 16). No provision was made in the Act for securing federal aid for the projects contemplated, and the Act provided but the single method of financing, i. e., by the sale of revenue bonds.

Later, some agreement was reached under which the board might secure federal aid in the construction of such works, but it was found that further legislation would be necessary if the state wished to avail itself of government beneficence. Governor Cooney therefore addressed a message to the Twenty-Fourth Legislative Assembly in which he called attention to this fact, and presented therewith three bills which the authorities in Washington deemed sufficient to accomplish this purpose. These bills were enacted and now appear as Chapters 95, 96 and 169 of the Laws of 1935.

Section 5 of Chapter 35 was amended by section 2 of Chapter 95, by dividing the provisions as to financing at the point where stars appear in the quotation above and there inserting the alternative provision, "or of a grant to aid in financing such construction from the United States of America or any instrumentality or agency thereof." The use of the disjunctive conjunction

"or" expresses an alternative choice or election to be exercised by the board, and renders that appearing in the clause following inapplicable to the subject matter of the clause preceding the conjunction. (See 2 Words and Phrases, Fourth Series, 876.) Thus it is apparent that, by amending section 5 of Chapter 35, the legislature provided two separate and distinct methods of constructing projects, in no manner conflicting: (1) Projects constructed by the water conservation board "to be paid wholly by means of or with the proceeds of revenue bonds." (2) Projects constructed with the aid of the government and to be paid by means "of a grant to aid in financing such construction from the United States * * * or any instrumentality or agency thereof." The line of demarcation between these two methods is clearly defined and was understood by the legislature; witness the declaration found in Chapter 96, broadening and extending the powers of the board, "supplemental to the powers conferred by any other law and not in substitution for the powers conferred by any other law." (Sec. 9.)

Under this interpretation of the law, the provisions of Chapter 169, Laws of 1935, which relators claim would divert the income from the proposed project under consideration to the state water conservation revolving fund, were enacted solely for the purpose of enabling the state properly to care for funds to be repaid to the state from projects constructed from funds advanced by the state, and where no money was advanced by the federal government. That such projects were in contemplation is evidenced by the declaration in the Governor's message, which was the moving cause of the legislature enacting the bills in the form submitted, when he said: "It may be necessary to construct certain smaller projects to be owned entirely by the State of Montana and paid for by the people of the localities receiving benefit. * * * I believe that the projects are adequate security not only as to the funds advanced by the Federal Government, but also those advanced by the State of Montana, so that all moneys advanced can be returned from the lands and people to be benefited thereby."

Each project, under the water conservation set up, becomes a part of the system of works, but the funds raised for the construction of each are kept separate (sec. 9, Chap. 35, Laws 1933–34, Ex. Sess.), and the party furnishing the funds for the construction of any project has a lien upon the funds until applied to such purpose. (Sec. 7, Chap. 35.)

Chapter 169, Laws of 1935, was enacted "for the purpose of carrying out the provisions of the Water Conservation Act"; section 1 thereof provides that the "conservation revolving fund" shall consist (together with other moneys) of "revenues arising from projects constructed or owned by the board in excess of costs of operation and maintenance, and repayment of principal and interest of any moneys borrowed for the construction of such projects."

The provisions of section 8 of Chapter 35, Laws of 1933–34, Ex. Sess., as amended by Chapter 95, section 3, Laws of 1935, are intended to embrace and provide for the issuance of revenue bonds as supplemented by a grant by, and to secure repayment of advances by, the federal government. Section 8A of Chapter 95 relates to trust indentures issued by the board.

The provisions of section 8, above, as amended, and of section 1 of Chapter 169, above, apply equally to all receipts under contracts with water users, and, when construed together as different methods of describing the income receivable from projects, there is no contradiction; the limitations or qualifications of the one apply to the other.

Analyzing the several Acts in the light of the clear intention of the legislature, every part of each thereof may be retained; there is no "implied repeal" to be found in Chapter 169.

It is asserted that the Acts in question are in violation of section 11 of Article III of our Constitution, in that by their provisions an irrevocable grant of special privileges, franchises and immunities is made. By the provisions of these Acts the Water Conservation Board is authorized to enter into contracts with the United States to secure grants and loans for the purpose of constructing the projects within the purview of the Acts,

and to issue revenue bonds to repay loans so made payable out of the receipts realized from the operations of the projects. These bonds must mature within a period of not more than forty years from their date. (Sec. 6, Chap. 35, Laws 1933–34, Ex. Sess.) The only grant whereby any privileges or immunities might possibly arise in favor of the United States would be as a result of the issuance of bonds, or by a mortgage or trust deed executed in favor of the United States to secure the payment of the bonds pursuant to the provisions of Chapter 95 of the Laws of 1935. No privilege, franchise or immunity is created by these Acts themselves in favor of the United States, and any such can only arise from the provisions of contracts entered into between the Water Conservation Board and the United States of America.

In the case of *Omaha Water Co.* v. *City of Omaha,* (C. C. A.) 147 Fed. 1, 6, 8 Ann. Cas. 614, 12 L. R. A. (n. s.) 736, the city of Omaha pursuant to legislative authorization entered into a contract with a water company whereby it was agreed that it should construct and maintain waterworks for the purpose of supplying the city and its inhabitants with water, and should have a right of way along the streets and public places of the city for the purpose of placing and maintaining mains, pipes and hydrants, for which the water company could charge stipulated rates for the term of twenty-five years. The contract was exclusive to the water company, which constructed the waterworks system and operated it under the contract for a period of twenty years. It was then sought by the city to reduce the rates, and in support of this action it was contended that the contract was in violation of section 16 of Article I of the Constitution of the state of Nebraska, which contained a provision in identical language with that of our section 11, Article III. In disposing of this contention adversely to the city, the court said: "But a contract made by a municipal corporation with a third person for the construction of a public building, a street railway, waterworks, or gas works, or for the supply of transportation, water, or any other public utility to the city and its inhabitants creates no special privilege or immunity within the

meaning of the first provision of the Constitution cited and neither the contract nor the power to make it is inhibited thereby. (*City of Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1, 14, 17, 19 Sup. Ct. 77, 43 L. Ed. 341; *City of Detroit* v. *Detroit Citizens' St. Ry. Co.*, 184 U. S. 368, 382, 388, 389, 22 Sup. Ct. 410, 46 L. Ed. 592.) One who makes such a contract to grade a street, to construct a building or to supply gas or water to a municipality may be said to acquire a monopoly of that work and a special privilege to perform it. But this special privilege or immunity is not granted to him by any law of the state. It is secured to him by his own agreement to render the public service." The contention is without merit.

Next it is urged that these Acts are in violation of section 1 ▉ of Article IV, and section 1 of Article V, of our Constitution, in that legislative power is delegated. The first section mentioned is the general division of the powers of government into three departments. The second vests the legislative power in the legislature, except as reserved to the people in the provisions for the initiative and referendum.

This court in discussing the purpose of section 1 of Article IV, in the case of *O'Neill* v. *Yellowstone Irr. Dist.*, 44 Mont. 492, 121 Pac. 283, 286, said: "As was pointed out in *State ex rel. Schneider* v. *Cunningham*, 39 Mont. 165, 101 Pac. 962: 'The purpose of the provision is to constitute each department an exclusive trustee of the power vested in it, accountable to the people alone for its faithful exercise, so that each may act as a check upon the other, and thus may be prevented the tyranny and oppression which would be the result of a lodgement of all power in the hands of one body.' Each department must therefore refrain from asserting a power that does not belong to it, for the assertion of such power is equally a violation of the trust. (Id.) And it is apparent that one department cannot lawfully delegate any of its powers to another or to any person or body. (*State* v. *Holland*, 37 Mont. 393, 96 Pac. 719; *In re Weston*, 28 Mont. 207, 72 Pac. 512; 6 Am. & Eng. Ency. of Law, 2d ed., 1022; Cooley's Const. Limitations, 163; *Case of Borough of West Philadelphia*, 5 Watts & S. (Pa.) 281.)"

In further explanation of the limitations imposed by our Constitution upon the delegation of power by one department to another, in the case of *State* v. *Johnson*, 75 Mont. 240, 243 Pac. 1073, 1077, it was written: "That section 1, Article IV, does not wholly prevent the exercise of functions of a nature belonging to one department by those administering the affairs of another is recognized in *State ex rel. Hillis* v. *Sullivan*, 48 Mont. 320, 137 Pac. 392, wherein Mr. Justice Sanner, speaking for this court, said: 'The separation of the government into three great departments does not mean that there shall be "no common link of connection, or dependence, the one upon the other in the slightest degree" (1 Story's Commentaries on the Constitution, sec. 525); it means that the powers properly belonging to one department shall not be exercised by either of the others. (Const., Art. IV, sec. 1.) There is no such thing as absolute independence.' He then cites numerous instances of the exercise of powers by one department which, from their nature, would seem to belong to another, but which are incidents to the proper discharge of the powers vesting in the department exercising them, or are reposed in the particular department as a matter of convenience in governmental affairs. 'While the power to make laws may not be delegated to a board or commission, * * * a certain policy or rule having been prescribed by statute, matters of detail in carrying out the executive duty of giving effect to the legislative will may be left to boards or commissioners.' "

And finally, in the case of *Chicago etc. Ry. Co.* v. *Board of Railroad Commissioners*, 76 Mont. 305, 247 Pac. 162, 164, after an exhaustive review of the authorities, this court said: "We think the correct rule as deduced from the better authorities is that if an Act but authorizes the administrative officer or board to carry out the definitely expressed will of the legislature, although procedural directions and the things to be done are specified only in general terms, it is not vulnerable to the criticism that it carries a delegation of legislative power." The rule thus announced was subsequently approved in the cases of *Northern Pacific Ry. Co* v. *Bennett*, 83 Mont. 483, 272 Pac. 987, *Barbour*

v. *State Board of Education,* 92 Mont. 321, 13 Pac. (2d) 225, and *State ex rel. City of Missoula* v. *Holmes,* ante, p. 256, 47 Pac. (2d) 624.

Without stopping to review in detail the provisions of these various Acts, it is sufficient to say from a careful examination of their provisions that the Water Conservation Board does not make the law, but in the execution of it as a public agency and as the agency of the law-making department, it is for the board to ascertain and declare the event upon which the expressed will of the legislature is to take effect. We are unable to sustain the contention.

It is next asserted that the Acts are violative of section 23 of Article V of the Constitution, in that more than one subject is contained therein and the subject matter is not clearly expressed in the title. ''Where all of the different parts of a statute have a natural connection and relate directly or indirectly to one legitimate subject of legislation, the Act is not invalid as containing more than one subject. (*Evers* v. *Hudson,* 36 Mont. 135, 92 Pac. 462; *State* v. *Ross,* 38 Mont. 319, 99 Pac. 1056; *State* v. *McKinney,* 29 Mont. 375, 74 Pac. 1095, 1 Ann. Cas. 579; *Barbour* v. *State Board of Education,* 92 Mont. 321, 13 Pac. (2d) 225.)'' (*Merchants' Nat. Bank* v. *Dawson County,* 93 Mont. 310, 19 Pac. (2d) 892, 900.)

The purpose of the constitutional provision under consideration is: '' 'That the unity required by this section is served notwithstanding the existence of many provisions in an Act where such provisions are germane to the general subject expressed.' '' (*Miller Insurance Agency* v. *Porter,* 93 Mont. 567, 20 Pac. (2d) 643, 645, and many cases there cited.) ''Germane'' means in close relationship; appropriate; relevant; pertinent. (*State ex rel. Nagle* v. *Leader Co.,* 97 Mont. 586, 37 Pac. (2d) 561.)

The matter set forth in these various chapters is all pertinent and revelant to the one general subject of water conservation, and hence the titles to these Acts do not contain more than one subject.

The purpose of section 23, Article V, so far as it provides that the subject shall be clearly expressed in the title of an Act, was stated by this court in the case of *State ex rel. Cotter v. District Court,* 49 Mont. 146, 140 Pac. 732, 734, as follows: "The prohibition is aimed at ordinary legislation with the subject of which the members of the legislative body and the public are not supposed to be familiar. Its purpose is: 'First, to prevent hodge-podge or "log-rolling" legislation; second, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles gave no intimation, and which might therefore be overlooked and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they shall so desire.' (Cooley Const. Lim. p. 205.)'' This statement is quoted with approval in the case of *State ex rel. Bonner v. Dixon,* 59 Mont. 58, 195 Pac. 841.

An examination of the titles of these Acts reveals that the provisions thereof are indicated so that no one who reads them would not be reasonably advised as to the contents of the particular bill. There is no subject contained therein which is not expressed in the title, and, consequently, this contention must fall.

It is asserted that Chapter 95 is in contravention of section 25 of Article V of the Constitution, which provides that: "No law shall be revised or amended, or the provisions thereof extended by reference to its title only, but so much thereof as is revised, amended or extended shall be re-enacted and published at length." The purpose of this provision has received the consideration of this court, and in the case of *King v. Pony Gold Min. Co.,* 24 Mont. 470, 62 Pac. 783, 786, it was observed that: "The object sought to be attained by the prohibition of the Constitution against amendments by reference to the title only of the Act to be amended was to remedy a well-known evil. Many statutes were amended by merely striking out or adding words or phrases, the amendatory statute giving no intimation of the

language of the statute so amended. To obviate the confusion and uncertainty consequent upon that mode of amendment, section 25 of Article V of the Constitution requires that the statute as amended shall be re-enacted and published at length.'' And again, in the case of *Spratt* v. *Helena Power Transmission Co.*, 37 Mont. 60, 94 Pac. 631, 636, the court quoted with approval from the case of *Ex parte Pollard,* 40 Ala. 77, as follows: ''It was never intended by the Constitution that every law which would affect some previous statute of variant provisions on the same subject should set out the statute or statutes so affected at full length. If this were so, it would be impossible to legislate. The constitutional provision reaches those cases where the Act is strictly amendatory or revisory in its character. Its prohibition is directed against the practice of amending or revising laws by additions, or other alterations, which without the presence of the original are usually unintelligible. If a law is in itself complete and intelligible, and original in form, it does not fall within the meaning and spirit of the Constitution.''

An examination of Chapter 95, in the light of the foregoing authorities, reveals that it does not in any manner offend against either the letter or the purpose of this constitutional provision.

It is contended that Chapter 95 is a special law granting a charter in violation of section 2 of Article XV of the Constitution, and special privileges, immunities and franchises in violation of section 26 of Article V. Section 2, Article XV, provides: ''No charter of incorporations shall be granted, extended, changed or amended by special law, except for such municipal, charitable, educational, penal or reformatory corporations as are or may be under the control of the state; but the legislative assembly shall provide by general law for the organization of corporations hereafter to be created; provided, that any such laws shall be subject to future repeal or alteration by the legislative assembly.''

By the provisions of the Acts in question, the Water Conservation Board is declared to be a body corporate and to be deemed an agency of the state of Montana; a public corporation. The only manner in which section 2 of Article XV may apply is if

we construe the word "municipal" in the exception to mean a true municipal corporation, as distinguished from a political subdivision. Under a similar constitutional provision excepting municipal corporations from the provisions of the section, it is generally held that the term "municipal" is used in its broadest sense to include those public corporations the purpose of the creation of which is an instrumentality of the state, and not for the regulation solely of the local and special affairs of a compact community. (*In re Scott,* 53 Nev. 24, 292 Pac. 291; *State Bar of California* v. *Superior Court,* 207 Cal. 323, 278 Pac. 432.)

Section 26 of Article V prohibits the passage of any local or special law "granting to any corporation * * * any special or exclusive privilege, immunity or franchise whatever." Granting such privilege or immunity to a public corporation such as the water conservation board, does not offend against this provision. (*In re Gibson,* 35 N. M. 550, 4 Pac. (2d) 643.)

It is said that the appropriations contained in these Acts are in violation of section 35 of Article V of the Constitution, reading as follows: "No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state, nor to any denominational or sectarian institution or association."

In the case of *State ex rel. Campbell* v. *Stewart,* 54 Mont. 504, 171 Pac. 755, 757, Ann. Cas. 1918D, 1101, this court had under consideration the validity of an appropriation made as a part of the War Defense Act. The purpose of the Act was to assist the United States by the raising of grain during the World War. In the administration of the law, farmers were aided by loans and received individual benefits from the Act. In response to the same contention there made, the court said: "Nor, with equal propriety, do the relators place any reliance upon the alleged departure from section 35 of Article V. That section forbids appropriations for 'charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state.' This is manifestly not such an appropriation, and the mere fact that the moneys

may be effective through individuals, associations or corporations in certain ways does not make it so. (*State ex rel. Cryderman* v. *Wienrich,* 54 Mont. [390], 170 Pac. 942.)'' The ultimate purpose there involved was a public one.

Section 15, Article III, of the Constitution, declares: ''The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution, or other beneficial use, and the right of way over the lands of others, for all ditches, drains, flumes, canals, and aqueducts, necessarily used in connection therewith, as well as the sites for reservoirs necessary for collecting and storing the same, shall be held to be a public use.'' In the case of *State* v. *Aitchison,* 96 Mont. 335, 30 Pac. (2d) 805, 808, we said of this section: ''The effect of this constitutional provision in declaring certain uses to be public, and the declaration of this court that the provision is self-executing, have the effect of foreclosing all inquiry into the question whether or not the enumerated uses are public, both by the legislature and the judiciary.''

The purpose of the appropriations above referred to is for a public use. The water conservation board is created by law. It is an agency of the state. It is under the control of the state; hence the contention here made cannot prevail.

It is alleged that the Acts under consideration are in contravention of section 36, Article V, Constitution, which provides: ''The legislative assembly shall not delegate to any special commission, private corporation or association, any power to make, supervise or interfere with any municipal improvement, money, property or effects, whether held in trust or otherwise, or to levy taxes, or to perform any municipal functions whatever.'' We recently gave consideration to the purpose of this section, in the case of *State ex rel. City of Missoula* v. *Holmes,* supra. As we there pointed out, the section was designed to protect cities and towns in their right of local self-government, and to prevent the intermeddling in their local affairs by commissioners whom they do not select and who are in no way responsible to the citizens of the community. The section is

wholly without application as applied to the enactments in question.

It is urged that section 5 of Article X of the Constitution is violated; it reads as follows: ''The several counties of the state shall provide as may be prescribed by law for those inhabitants who, by reason of age, infirmity or misfortune, may have claims upon the sympathy and aid of society.'' If it may be said that in some manner the inhabitants of the several counties who have claims upon the sympathy and aid of society are by these acts assisted, relators' argument is foreclosed by our decision in the case of *Mills* v. *State Board of Equalization,* 97 Mont. 13, 33 Pac. (2d) 563, 567, where we said: ''The legislature has plenary power in the enactment of legislation, except so far as it is inhibited by the Constitution. (*O'Connell* v. *State Board of Equalization,* supra [95 Mont. 91, 25 Pac. (2d) 114], and cases there cited.) When the framers of our Constitution by section 5 of Article X made it the duty of counties to provide for the support and care of unfortunates, it did not thereby restrict the legislature to likewise make provision where the state was to assist in the care of these deserving persons. In the case of *State* v. *State Board of Equalization,* 56 Mont. 413, 185 Pac. 708, 711, 186 Pac. 697, this court said: 'The maxim, *Expressio unius est exclusio alterius,* invoked by respondents, is a rule of interpretation, and not a constitutional command, and cannot be made to serve as a means to restrict the plenary power of the legislature, nor to control an express provision of the Constitution.' ''

It is contended that by Chapter 35 appropriations are made for a longer term than two years and, therefore, in violation of section 12, Article XII. Similar Acts have been repeatedly upheld by this court. In the case of *State ex rel. Veeder* v. *State Board of Education,* 97 Mont. 121, 33 Pac. (2d) 516, 521, we said: ''As the Act has to do only with special funds to arise from the operations authorized and in connection therewith and devoted to a special purpose, it does not violate the provisions of sections 34 and 39 of Article V, or section 10 of Article XII, of the Constitution, respecting state moneys and the appro-

priation thereof. (*Barbour* v. *State Board of Education*, 92 Mont. 321, 13 Pac. (2d) 225; *State ex rel. Bickford* v. *Cook*, 17 Mont. 529, 43 Pac. 928.)'' In like circumstances this holding was approved in *State ex rel. Blume* v. *State Board of Education*, 97 Mont. 371, 34 Pac. (2d) 515, and *State ex rel. Hawkins* v. *State Board of Examiners*, 97 Mont. 441, 35 Pac. (2d) 116, 118. These cases are conclusive on the question and dispose of the contention adversely to relators.

It is said that by the Acts section 1 of Article XIII of the ▇▇▇ Constitution is violated. It provides that: ''Neither the state, nor any county, city, town, municipality, nor other subdivision of the state shall ever give or loan its credit in aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association or corporation, or become a subscriber to, or a shareholder in, any company or corporation, or a joint owner with any person, company or corporation, except as to such ownership as may accrue to the state by operation or provision of law.'' It is generally held under like constitutional provisions that neither the United States nor the state is an ''individual, association or corporation'' within the meaning of the section. (*Malone* v. *Peay*, 159 Tenn. 321, 17 S. W. (2d) 901; *Ransom* v. *Rutherford County*, 123 Tenn. 1, 130 S. W. 1057, Ann. Cas. 1912B, 1356; *Lancey* v. *King County*, 15 Wash. 9, 45 Pac. 645, 34 L. R. A. 817; *Walker* v. *Cincinnati*, 21 Ohio St. 14, 8 Am. Rep. 24.) Furthermore, the contention is effectively answered by our decisions in the cases of *Barbour* v. *State Board of Education*, supra, *State ex rel. Veeder* v. *State Board of Education*, supra, and *State ex rel. Hawkins* v. *State Board of Examiners*, supra.

It is alleged that these Acts conflict with section 2, Article ▇▇▇ XIII, of the Constitution, in that they create a debt in excess of the limitations therein prescribed, in that the revenue bonds proposed to be issued create a debt against the state, and that a mortgage to be issued securing the bonds likewise creates such debt. Section 6 of Chapter 35 provides in part: ''All bonds issued under this Act shall contain a statement on their face that the state shall not be obligated to pay the same or the

interest thereon except from the special fund hereinafter set forth. \* \* \* Such bonds shall not constitute or be a debt, liability or obligation of the state, and shall be secured only by the revenues of such works and the funds received from the sale or disposal of water and from the operation, lease, sale or other disposition of the works, property and facilities to be acquired out of the proceeds of such bonds.''

The bonds of each project are payable only from the revenues derived therefrom. Such a plan does not violate this provision of the Constitution. (*State ex rel. Veeder* v. *State Board of Education,* supra; *State ex rel. Blume* v. *State Board of Education,* supra; *State ex rel. Hawkins* v. *State Board of Examiners,* supra.) The section does not prohibit the mortgaging of property, unless thereby a debt of the state is created. Section 8A of Chapter 95 authorizes the mortgaging of the property of each project constructed with proceeds of bonds. Section 16 of Chapter 35 provides in part: ''All general administrative expenses of the Board and the cost of investigations as authorized in section 5, of this Act, shall be paid from the Administration Fund and also the cost of all preliminary work on any project and all expenses directly chargeable to such project, prior to the receipt of the proceeds of bonds, shall be paid from the Administration Fund. The amount of all such expenses on account of any project or projects and such part of the general administrative expenses of the board and the cost of investigation or investigations as shall be properly chargeable, in the opinion of the board, to such project or projects, shall be reimbursed to the Administration Fund upon the receipt of the proceeds of bonds issued for such project or projects.'' Thus it will be seen that from the proceeds of the bonds on any given project, the state will be reimbursed for its entire outlay on the particular project.

A somewhat similar provision was found in the Act under consideration in the case of *State ex rel. Hawkins* v. *State Board of Examiners,* supra, and of it we said: ''The provision of the Act under consideration that the building may be mortgaged or deeded in trust for the benefit of the bondholders does not

tend to subject the state to liability, because it does not purport to encumber any property owned by the state." Here, when the state will own the property mortgaged, but on being reimbursed for its entire outlay on behalf of the project, it will hold only the naked legal title, the equitable title passing to the mortgagee who has furnished the funds to reimburse the state. No debt of the state is thereby created.

The sixteenth asserted reason why the injunction should issue is that "the action about to be taken by the State Water Conservation Board in entering into a water marketing agreement with the Rock Creek Water Users' Association is illegal, because said contract provides (a) for an unlawful forfeiture of the equity acquired by said Association in said project and the water rights pertaining thereto, for in the event of default by said Association the rights of the latter under the contract and the aforesaid equity may be terminated, without compensation, even though said Association has made payments under said contract over a long period of years; (b) * * * that, in the event of the termination * * * the Association nevertheless shall continue to be liable for monies then due under such contract; (c) that the * * * board may cease and refuse to furnish water to said Association in the event of ·a default * * * notwithstanding the fact that there may be other adequate remedies available to cure the default * * * ; and (d) that the Association may be held liable for payments and for the performance of obligations accruing during the period the water is being withheld from it by reason of its default."

Under the plan outlined in the Water Conservation Act and under the contract here attacked, the board will own the project and the water rights acquired for its operation. The payments and obligations assumed, or to be assumed, by the association "are for the privilege of obtaining water so long as the association shall not be in default," and it is therein expressly understood and agreed that "the Association shall acquire no rights or equities under this contract which will in any manner preju-

dice the right of the board to terminate this contract in the event that the Association shall be in default.''

The foregoing complaints against the contract go to the expediency of entering into the contract, rather than its legality after it is executed. On the face of the contract it must be presumed that the annual receipt of water thereunder forms an adequate consideration for the annual payments required. The courts are not guardians of persons *sui juris* to protect them from signing contracts into which they desire to enter; the province of the court is to interpret and enforce contracts in accordance with their terms, when legitimate and based upon a valid consideration. (*W. T. Rawleigh Co.* v. *Washburn,* 80 Mont. 308, 260 Pac. 1039; *Linn* v. *French,* 97 Mont. 292, 33 Pac. (2d) 1002.)

The contract before us is legitimate and based upon a valid consideration; the provisions above challenged contain but the ordinary principles of such a contract.

It is further contended under this head (e) that the provision for payment of operating costs and deficits are so indefinite and uncertain as to render them unenforceable as a debt or otherwise; and (f) that the contract provides for the creation of a perpetuity, in violation of section 5 of Article XIV of the Constitution.

The contract will require the board to give to the association notice, sixty days in advance of the due date of the annual payments, of the amount to be paid; only in this manner would the association know how much it will be required to pay, at least after the passage of a few years, for the contract provides for a reduction in the stated amount if a surplus has accumulated, and, in case of a deficit in operation funds, the association must make up the deficit. However, the contract provides a definite method for the determination of these matters, and is not open to the charge here made against it, within the rule announced in *State ex rel. City of Missoula* v. *Holmes,* heretofore referred to. There is no merit in the assertion that the contract provides for the creation of a perpetuity.

The above objections to the contract between the board and the association are urged against the water purchase agreements of the individual users; what is said as to the former sufficiently answers the objections of the latter. These contracts contain but the ordinary provisions for the protection of those who loan money generally.

It is next asserted that: "The action taken or about to be taken by the Rock Creek Water Users' Association in the issuance of its stock, the retention of option thereon, the limitations on the sale thereof contained in its Articles of Incorporation, by-laws and the proposed contract with the * * * board, is illegal because such action constitutes an invalid restraint on the alienation of such stock." Again we have but a contract between parties capable of contracting. These provisions, which really amount to agreements between the stockholders themselves, do not amount to an improper restraint of the power of alienation. (*Scruggs* v. *Cotterill*, 67 App. Div. 583, 73 N. Y. Supp. 882; *Fitzsimmons* v. *Lindsay*, 205 Pa. 79, 54 Atl. 488.) There seems to be no objection to a corporation reserving to existing members the right to choose their associates (*Barrett* v. *King*, 181 Mass. 476, 63 N. E. 934), nor in the corporation thus protecting its contracts, and, the provision "being in the charter, is notice to all persons dealing with the stock." (See 6 Thompson on Corporations, 3d ed., sec. 4156.)

Finally it is asserted that the construction contract has been, or will be, improperly awarded to the Utah Construction Company, inasmuch as the bidder's "bid bond" was not signed by the resident agent. We find no statutory requirement of this nature with reference to a bond of this character, nor any regulation of the state auditor to that effect. Sections 6160 and 6169, Revised Codes 1921, have application only to fire insurance contracts and indemnity for fire insurance losses.

The courts, generally, hold that provisions of this nature are for the benefit of the public agency for which the work is to be done, and, therefore, may be waived. (*McCord* v. *Lauterbach*, 91 App. Div. 315, 86 N. Y. Supp. 503; *Gage* v. *City of New York*, 110 App. Div. 403, 97 N. Y. Supp. 157; *Hornung* v. *Town of*

*West New York,* 82 N. J. L. 266, 81 Atl. 1116; *Cady* v. *City of San Bernardino,* 153 Cal. 24, 94 Pac. 242.) Here, before the bid was approved, the bond was countersigned by a local agent. Whether the condition was waived, or the defect, if defect it was, was cured by the act of the local agent, the bond is sufficient.

Having given careful consideration to all of the objections raised by the relators and found no one of them of sufficient merit to warrant the issuance of the writ for which they pray, or to entitle them to any relief, the motion to quash is sustained and the proceeding dismissed.

MR. CHIEF JUSTICE SANDS, absent on account of illness, takes no part in the foregoing decision.